STATE OF NEBRASKA, APPELLEE, v. ERWIN CHARLES SIMANTS, APPELLANT.

250 N. W. 2d 881

Filed February 2, 1977. No. 40642.

Beatty, Morgan & Vyhnalek and Keith N. Bystrom, for appellant.

Paul L. Douglas, Attorney General, and Paul W. Snyder, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

SPENCER, J.

This case is before us for review of a death penalty imposed after a jury conviction on six counts of murder in the first degree.

Defendant essentially alleges four assignments of error: (1) The statute under which the sentence was imposed is unconstitutional; (2) the evidence is insufficient to support the findings of the jury; (3) the court erred in excluding the testimony of defendant's ex-wife; and (4) the sentence imposed is excessive and contrary to law. We affirm.

During the course of the afternoon of October 18, 1975, defendant drank at one of the local bars in Sutherland, Nebraska, with members of his family and friends. At approximately 8 o'clock p.m., defendant asked his sister, Mrs. Boggs, to take him to her residence where he was residing. The residence was located next to the residence of Henry Kellie. After returning defendant to her home, his sister returned to the bar. Defendant visited with his 13-year-old nephew, then went to his brother-in-law's bedroom for a .22-caliber rifle. He obtained some shells and loaded it. He then told the nephew to keep the kids in the house, and left the sister's residence.

Some 45 minutes later defendant returned to the sister's home, unloaded the rifle, put it back in place, and wrote a note at the kitchen table, as follows: "I am sorry to all — it is the best way out — do not crie (sic)." Defendant then told the nephew he had just killed the Kellies, and named them to him. He then

had his nephew call his mother, who resided in Sutherland, and defendant told her about the killings. He then went to the home of his parents and told them he had just killed the Kellies. His father went to the Kellie home, came back to his own home, told his wife what he had found, and she called the authorities.

Defendant left his parents' home, went to two downtown bars, drank some beer at each, and returned to a field at the rear of the Boggs' residence. He remained there until approximately 8 a.m. the morning of October 19, 1975. At that time he tried to get in his sister's house and was refused admission. His sister called the authorities to whom he gave a statement.

For the purposes of this appeal it is sufficient to say that defendant attempted to have sexual relations with Florance Marie Kellie, a 10-year-old girl. During the process he shot her in the forehead with a .22-caliber rifle, which caused her death. He then heard the girl's grandfather, James Henry Kellie, approaching. He went to the bedroom doorway and shot him as he approached. He then dragged the body into the bedroom. Shortly thereafter, Audrey Marie Kellie, the child's grandmother, entered the house. Defendant killed her with a shot in the forehead, and the evidence would indicate some sexual molestation. Shortly thereafter, the Kellie's son, David Leroy Kellie, and his two children came to the house. Defendant then killed David and his two children; Daniel Leroy, who was approximately 5 years of age; and Deanna, who was 7 years of age. The evidence would indicate some sexual molestation of Deanna. All deaths were caused by the gunshot wounds.

We initially consider defendant's contention that sections 29-2519 et seq., R. R. S. 1943, outlining the capital punishment procedures, are in violation of the Eighth and Fourteenth Amendments to the United States Constitution and sections 3 and 9 of the Bill of Rights of the Constitution of the State of Nebraska. Suffice it

to say that since Furman v. Georgia, 408 U. S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), from which defendant quotes substantially, the United States Supreme Court on July 2, 1976, decided the cases of Gregg v. Georgia, 428 U. S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); Proffitt v. Florida, 428 U. S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); and Jurek v. Texas, 428 U. S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976). These cases answered some of the questions raised by Furman and now urged by defendant.

In Gregg, the Supreme Court noted capital punishment was accepted by the framers of the Constitution, and that for nearly 2 centuries the Court has recognized its use for the crime of murder is not invalid per se. The Court also noted legislative measures adopted by the people's chosen representatives weigh heavily in ascertaining contemporary standards of decency. It answered the argument that the Eighth Amendment, forbidding cruel and unusual punishment, should be construed as prohibiting the death penalty by pointing to the fact that in the 4 years since Furman was decided, Congress and at least 35 states have enacted new statutes providing for the death penalty. The Court further noted that retribution and the possibility of deterrence of capital crimes by prospective offenders are not impermissible considerations for a Legislature to weigh in determining whether the death penalty should be imposed. Importantly herein, it observed that capital punishment for the crime of murder cannot be viewed as invariably disproportionate to the severity of that crime.

Of particular moment in answering some of the arguments of the defendant is the observation that the concerns expressed in Furman that the death penalty not be imposed arbitrarily or capriciously, can be met by carefully drafted statutes. These statutes should insure the sentencing authority is given adequate information and guidance. It noted these concerns are best

met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relative to the imposition of sentence and provided with standards to guide its use in that information.

Because Gregg v. Georgia, *supra,* adequately answers the questions raised by the defendant as to the applicability of the death penalty in this case, we concern ourselves with an analysis of the Nebraska statute in the light of that case.

The Nebraska statute, as amended after the United States Supreme Court's decision in Furman v. Georgia, 408 U. S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), retains the death penalty for any person deemed guilty of first-degree murder as defined in section 28-401, R. R. S. 1943. The defendant's guilt or innocence is determined in the traditional manner, either by a trial judge or a jury. Whenever the trial is by jury, the jury has nothing whatsoever to do with the sentencing determination. If trial is by jury, the trial judge is required to charge lesser included offenses when they are supported by any credible evidence presented. The sentencing procedures are essentially the same in both bench and jury trials and are in large part patterned after the Model Penal Code.

Whenever any person is found guilty of first-degree murder, the District Court fixes a date for a hearing on determination of the sentence to be imposed. The sentence determination shall be made by either the judge who presided at the trial or who accepted the guilty plea, or a panel of three judges, including the judge who presided or accepted the plea, or in case of his disqualification for any reason, by a panel of three District Judges named by the Chief Justice of the Supreme Court.

In the proceeding to determine the sentence, evidence may be presented as to any matter that the court deems relevant to the sentence, and shall include matters re-

lating to any of the aggravating or mitigating circumstances. These are set forth in section 29-2523, R. R. S. 1943, and are as follows:

"(1) Aggravating Circumstances:

"(a) The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity;

"(b) The murder was committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime;

"(c) The murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant;

"(d) The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence;

"(e) At the time the murder was committed, the offender also committed another murder;

"(f) The offender knowingly created a great risk of death to at least several persons;

"(g) The victim was a law enforcement officer or a public servant having custody of the offender or another; or

"(h) The crime was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws.

"(2) Mitigating Circumstances:

"(a) The offender has no significant history of prior criminal activity;

"(b) The offender acted under unusual pressures or influences or under the domination of another person;

"(c) The crime was committed while the offender was under the influence of extreme mental or emotional disturbance;

"(d) The age of the defendant at the time of the crime;

"(e) The offender was an accomplice in the crime

committed by another person and his participation was relatively minor;

"(f)  The victim was a participant in the defendant's conduct or consented to the act; or

"(g)  At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication."

Additionally, the court may receive any evidence of mitigating factors which it deems to have probative value.

Section 29-2261, R. R. S. 1943, requires the court to order a presentence investigation before a defendant is sentenced.  The defendant, his counsel and counsel for the State are permitted to present oral arguments for or against the sentence of death.  It should here be noted that the court is required to set forth a general order of procedure at the outset of the sentencing procedure.  This was done herein.

Section 29-2522, R. R. S. 1943, requires that the judge or judges presiding at the sentencing procedure shall fix the sentence at either death or life imprisonment but such determination shall be based upon the following considerations:

"(1)  Whether sufficient aggravating circumstances exist to justify imposition of a sentence of death; or

"(2)  Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances.

"In each case in which the court imposes the death sentence, the determination of the court shall be in writing and shall be supported by written findings of fact based upon the records of the trial and the sentencing proceeding, and referring to the aggravating and mitigating circumstances involved in its determination."

Sections 29-2524 through 29-2528, R. R. S. 1943, pro-

vide for an automatic review of all capital punishment cases. The review eliminates the need for a petition of error where the punishment is capital. The clerk of the District Court is required to automatically notify the court reporter to prepare a bill of exceptions and provides that the cost of printing briefs shall be borne by the county. The execution of the sentence is suspended pending the automatic review of the case by the Supreme Court of Nebraska.

Before we consider the procedures further, we turn to defendant's contention that the lack of jury involvement in the sentencing procedure is contrary to the due process clause of the Fourteenth Amendment to the United States Constitution as well as Article I, section 3, of the Bill of Rights, of the Constitution of the State of Nebraska. The United States Supreme Court, in Proffitt v. Florida, 428 U. S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), has held that jury sentencing in a capital case is not constitutionally required. In that case the Court stated in upholding the Florida procedure: "The basic difference between the Florida system and the Georgia system is that in Florida the sentence is determined by the trial judge rather than by the jury. This (the United States Supreme) Court has pointed out that jury sentencing in a capital case can perform an important societal function, Witherspoon v. Illinois, 391 U. S. 510, 519 n. 15, but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases."

Inferentially, Nebraska has met this contention in the application of its habitual criminal law. We have repeatedly sustained the constitutionality of that law. In

Nebraska the increased punishment for a subsequent felony is a court determination and not one for a jury. See State v. Losieau, 184 Neb. 178, 166 N. W. 2d 406 (1969).

As we understand the federal and the state constitutional provisions, they do not require or even suggest that jury sentencing is constitutionally required. Whatever the relative merits of sentencing by a judge or jury may be, we need not consider them. Our concern is the constitutionality of the Nebraska system, under the federal and state Constitutions. The relative merits of the one or the other is for legislative and not judicial determination. We find the sentencing procedure provided by the Nebraska statute does not violate either the Nebraska or the federal Constitution.

Defendant argues that the Nebraska death penalty procedures are constitutionally invalid because they are silent as to what burden must be met before an aggravating circumstance is proven to exist by the sentencing authority. He argues that aggravating circumstances must be proved to exist beyond a reasonable doubt. That question is not involved in this case because the aggravating circumstances found to exist here were clearly found to exist beyond a reasonable doubt.

In Grandsinger v. State, 161 Neb. 419, 73 N. W. 2d 632 (1955), this court said: " 'The doctrine of reasonable doubt has no application to the jury's determination as to the penalty to be imposed.' " That case was decided at a time when the jury determined whether the sentence should be death or life imprisonment in capital cases. The present statute has changed that rule. It may be forcibly argued that there is no reason or logic why a similar rule should not apply to judicial sentencing. However, the law has been substantially changed and the question should be reconsidered in regard to the imposition of the death penalty.

Section 29-2522, R. R. S. 1943, now requires a determination after hearing that sufficient aggravating cir-

cumstances exist to justify the imposition of a death penalty. As the United States Supreme Court noted in Woodson v. North Carolina, 428 U. S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976): "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."

We believe the obvious intent of the statute is that the enumerated aggravating circumstances should require strong proof. Aggravating circumstances are now a mandatory element to be considered in capital cases. The sentence depends upon the proof of some aggravating circumstance. We believe it is the intent of the act to require the facts upon which the aggravating circumstances referred to in section 29-2523, R. R. S. 1943, are based be proved beyond a reasonable doubt, and so construe it. We hold that the rule enunciated in Grandsinger v. State, *supra*, is not applicable to our present law.

Defendant maintains the Nebraska capital punishment statute does not remove the substantial risk that the death penalty will be inflicted in an arbitrary or capricious manner. It ·is pointed out that at various stages in the proceedings discretion may be exercised by the prosecutor, the jury, the sentencing judge, the Nebraska Supreme Court, and the Board of Pardons. Thus, the defendant argues the prosecutor is not required to charge a capital offense in all cases where the facts might support such a charge. He is further empowered to enter into plea bargaining with the defendant. The jury, although not involved in sentencing in Nebraska, may still affect the outcome by convicting the defendant of a lesser included offense not punishable by death. And even after the defendant has been

sentenced to death, his sentence may be commuted at the discretion of the Board of Pardons.

These objections were raised in Gregg v. Georgia, 428 U. S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), and found to be without merit: "The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. Furman, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant."

Language contained in a footnote to the paragraph just quoted suggests a system without such discretion would be unconstitutional: "The petitioner's argument is nothing more than a veiled contention that Furman indirectly outlawed capital punishment by placing totally unrealistic conditions on its use. In order to repair the alleged defects pointed to by the petitioner, it would be necessary to require that prosecuting authorities charge a capital offense whenever arguably there had been a capital murder and that they refuse to plea bargain with the defendant. If a jury refused to convict even though the evidence supported the charge, its verdict would have to be reversed and a verdict of guilty entered or a new trial ordered, since the discretionary act of jury nullification would not be permitted. Finally, acts of executive clemency would have

to be prohibited. Such a system, of course, would be totally alien to our notions of criminal justice.

"Moreover, it would be unconstitutional. Such a system in many respects would have the vices of the mandatory death penalty statutes we hold unconstitutional today in Woodson v. North Carolina, post, p. 280, and Roberts v. Louisiana, post, p. 325. The suggestion that a jury's verdict of acquittal could be overturned and a defendant retried would run afoul of the Sixth Amendment jury-trial guarantee and the Double Jeopardy Clause of the Fifth Amendment."

The argument that the sentencing judge is given too much discretion under the Nebraska scheme has also been foreclosed by the United States Supreme Court decisions. As noted, the Florida statute is very similar to the Nebraska statute in that the sentencing authority is required to weigh statutory aggravating and mitigating circumstances. This system, requiring an examination of the circumstances of each case, was expressly approved in Proffitt v. Florida, 428 U. S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), as the court stated: "On their face these procedures, like those used in Georgia, appear to meet the constitutional deficiencies identified in Furman. The sentencing authority in Florida, the trial judge, is directed to weigh eight aggravating factors against seven mitigating factors to determine whether the death penalty shall be imposed. This determination requires the trial judge to focus on the circumstances of the crime and the character of the individual defendant. He must, inter alia, consider whether the defendant has a prior criminal record, whether the defendant acted under duress or under the influence of extreme mental or emotional disturbance, whether the defendant's role in the crime was that of a minor accomplice, and whether the defendant's youth argues in favor of a more lenient sentence than might otherwise be imposed. The trial judge must also determine whether the crime was committed in the course

of one of several enumerated felonies, whether it was committed for pecuniary gain, whether it was committed to assist in an escape from custody or to prevent a lawful arrest, and whether the crime was especially heinous, atrocious, or cruel. To answer these questions, which are not unlike those considered by a Georgia sentencing jury, compare Gregg v. State, ante, p. 40, the sentencing judge must focus on the individual circumstances of each homicide and each defendant."

In Gregg v. Georgia, 428 U. S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), it was stated: "As a result, while some jury discretion still exists, 'the discretion to be exercised is controlled by clear and objective standards so as to produce nondiscriminatory application.' Coley v. State, 231 Ga. 829, 834, 204 S. E. 2d 612, 615." Whether the Nebraska statute provides clear standards will be considered later.

That the sentencing authority must exercise some degree of discretion can further be seen in the two cases which struck down statutory schemes providing for mandatory imposition of the death penalty in all cases of first-degree murder. Woodson v. North Carolina, 428 U. S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976); Roberts v. Louisiana, 428 U. S. 325, 96 S. Ct. 3001, 49 L. Ed. 2d 974 (1976).

The Supreme Court has indicated in its opinions that meaningful appellate review may be required to insure that the death penalty is not applied in an arbitrary or capricious manner. Defendant asserts that the Nebraska system is deficient in this regard because there are no statutory guidelines for the Nebraska Supreme Court such as are provided in Georgia. We answer that this court, in every case under the new statute, will perform its function of death sentence review with a maximum of rationality and consistency. While we do not have the Georgia provision for proportional review, every capital case where there can be the slightest question will be considered in comparison with other capital

cases. In other words, we will compare each capital case under review with those previous cases in which the death penalty has or has not been imposed under the new statute. By this means review by this court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case.

Defendant urges that the language employed in the Nebraska statute describing aggravating and mitigating circumstances is so vague and overbroad that a substantial likelihood exists that the death penalty will be applied arbitrarily and capriciously. This same claim was urged in Gregg v. Georgia, *supra,* where it is stated: "While such standards are by necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary. Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner."

The Supreme Court in Gregg determined that, as construed by the state court, the standards provided adequate guidance for sentencing. The trial court herein made written findings reviewing the aggravating and mitigating standards considered in the imposition of the death penalty. In doing so, it specifically reviewed each of the standards in light of the record before it. We now review the trial court's findings in light of our construction of those provisions.

Defendant herein was charged with six separate counts of murder, as follows: Count I, James Henry Kellie; count II, Audrey Marie Kellie; count III, David Leroy Kellie; count IV, Daniel Leroy Kellie; count V, Deanna Lynn Kellie; and count VI, Florance Marie Kellie.

The trial court discussed the standards as they pertained to the separate counts on which the defendant was convicted. We have heretofore set out the standards as they are defined in the statute. We will refer to them here by the letter which enumerates the standard in the statute.

We first refer to the aggravating circumstances. Subsection (a) covers previous murder convictions or crimes involving the use of threat of violence to the person. The last clause obviously describes persons with previous histories of serious assaultive or terrorizing criminal activity. These are words in common usage with meanings well fixed and clearly understandable. The trial court found that (a) was not present and did not apply, and we agree.

Subsection (b) is intended to cover those situations where a murder is committed in an effort to conceal the commission of a crime or to conceal the identity of the perpetrator of that crime. The court found this standard did not apply with regard to the murder of Florance Marie Kellie, or the sixth count. It found that murder was committed in an effort to perpetrate a first-degree sexual assault. The court found after Florance Marie Kellie was murdered the other murders were committed in an apparent attempt to conceal the commission of the crime or the identity of the perpetrator of it. With these findings, we agree.

The court found subsection (c) did not apply to any of the counts. With this we agree. We construe subsection (c) to include those situations where the murder was committed for hire, where the murder was itself committed for a pecuniary gain, or where the defendant hired another to commit a murder for him.

The court found that subsection (d) applied to three of the murders but not to the three others. With regard to the first murder, or count VI, the court found it was done in the perpetration of a first-degree sexual assault. The sexual assault caused pain, and when the

young girl cried out she was killed and there was a further sexual assault upon her after death. The court specifically found the standard applied to the murder of Audrey Marie Kellie, count II, considering the difference in the ages of the defendant and the victim, coupled with the attack on her body after her death. The court also specifically found that the murder perpetrated upon Deanna, the 7-year-old child, coupled with the bruises displayed on the inside of her thighs in the immediate vicinity of her pubic area, were sufficient to bring it within the ambit of the standard.

The court specifically found the murder of Daniel, the 5-year-old boy, might evidence some sign of depravity, but found subsection (d) did not apply. The court further found the section did not apply to the murders of David Leroy Kellie or James Henry Kellie.

In construing subsection (d) it might be argued that all killings are atrocious. Obviously, the Legislature intended something more than the fact that there had been a murder in the use of this phraseology. The Florida Supreme Court in State v. Dixon, 283 So. 2d 1 (1973), defines the terms "heinous, atrocious, or cruel" to be directed to the conscienceless or pitiless crime which is unnecessarily torturous to the victim. We accept that construction, and to us it is obvious that it was followed by the trial court.

The Florida law does not include the following language found in the Nebraska standard: "* * * or manifested exceptional depravity by ordinary standards of morality and intelligence." In interpreting this portion of the statute, the key word is "exceptional." It might be argued that every murder involves depravity. The use of the word "exceptional," however, confines it only to those situations where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence. We find such depravity was present in the murder of the three females.

Subsection (e) is clear, easily understood, and no

clarification or construction is necessary. The court found that at the time each murder was committed, the offender committed five other murders, and therefore subsection (e) applied to each of the counts.

Subsection (f) refers to those situations where the act of the defendant also endangered the lives of others. The trial court found this standard did not apply in this case and we agree. We interpret it to cover those situations where the act of the defendant jeopardizes the lives of more than two other persons, such as the use of bombs or explosive devices, the indiscriminate shooting into groups, or at a number of individuals, or other like situations.

Subsection (g) is clear, readily understandable, and needs no construction. The court found that (g) was not applicable herein.

Subsection (h) refers to those crimes intended to disrupt or hinder the lawful exercise of a governmental function or the enforcement of the laws. The trial court found that (h) had no application herein.

We are now concerned with the mitigating circumstances. Defendant had been convicted of contributing to the delinquency of a minor on February 26, 1967. On appeal to the District Court a demurrer was sustained to the charge. It was then appealed to the Supreme Court where the judgment of the District Court for Lincoln County was reversed. See State v. Simants, 182 Neb. 491, 155 N. W. 2d 788 (1968). On remand, the case was never prosecuted further in the District Court. Defendant had several misdemeanor convictions, including one conviction of intoxication and reckless driving. The presentence investigation indicated that defendant apparently had been guilty of statutory rape several years before but the matter was not called to the attention of the authorities and no prosecution resulted.

The trial court did find that the defendant had a significant history of prior criminal activity. While it is

immaterial on the present record, we would consider this to be a very borderline finding. It does, however, involve two instances involving girls under 15. The standard reads: "The offender has no significant history of prior criminal activity." We agree with the District Court. The statute reads "prior criminal activity" and not "prior criminal convictions." We note, however, that the statute says "significant history." We do not find this to be a significant history and give the defendant the benefit of any doubt. As we have previously held, criminal activity must be proved beyond a reasonable doubt. While we concede that criminal activity may be proved, obviously the burden of proof is greater in the absence of prior convictions.

The trial court found subsection (b), "The offender acted under unusual pressures or influences or under the domination of another person" was not applicable. We agree.

The court found the crime was not committed while the offender was under the influence of extreme mental or emotional disturbance, which is subsection (c). While defendant's defense was predicated upon insanity, we agree with the finding of the trial court.

Subsection (d) reads: "The age of the defendant at the time of the crime." At the time of the crime, the defendant was approximately 30 years of age. We agree with the finding of the trial court, the defendant was not of such tender age that this should in any way be considered as a mitigating circumstance. We interpret this language to refer to a child of tender age, a juvenile, or to a person of advanced years, where senility may be involved.

The trial court correctly found subsection (e) was not applicable. This standard refers to those situations where the offender may have been only an aider or an abettor and his role in the murder was negligible.

The trial court properly found that while the record does not reflect the exact course of conduct of any of

the victims, subsection (f) is not applicable herein. As the court noted, Florance Marie Kellie, the 10-year-old child, could not knowingly consent to an act of first degree sexual assault.

Subsection (g) provides as follows: "At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law was impaired as a result of mental illness, mental defect, or intoxication." The trial court found that as the result of the combination of the influence of intoxicating liquors, defendant's low intelligence level, together with any mental deficiency, this standard was a mitigating circumstance to be considered in each of the six counts on which he was convicted. We agree.

In the balancing of the aggravating and mitigating circumstances, we emphasize the death penalty will not be imposed simply because the aggravating circumstances may outnumber the mitigating circumstances. Rather, the test is whether the aggravating circumstances in comparison outweigh the mitigating circumstances. The death penalty is not to be imposed if sufficient mitigating circumstances exist, which approach or outweigh the weight to be given the aggravating circumstances. In balancing the aggravating and the mitigating circumstances, we agree with the trial court. The presence of aggravating circumstances (b), (d), and (e) in some or all the murders far outweighs any consideration we give to mitigating circumstances (a) and (g). In our review of the record, the defendant at the time of the murders knew the nature and quality of his acts. He knew they were wrong and that he would be punished if caught. In our judgment, this motivated the murders. We determine the imposition of the death penalty was justified and is amply sustained by the record.

We now consider defendant's contention that the evidence is insufficient to support the findings of the jury.

He predicates this assignment on the jury's rejection of the defendant's insanity defense. In defendant's brief and argument, he seems to be arguing for the Durham rule, which has been rejected in Nebraska. In State v. Jacobs, 190 Neb. 4, 205 N. W. 2d 662 (1973), we said: "The test of responsibility for crime is the defendant's capacity to understand the nature of the act alleged to be criminal and the ability to distinguish between right and wrong with respect to the act."

In that same case, we said: "The fact that a defendant may have some form of mental illness or deficiency does not of itself constitute a defense or establish lack of responsibility."

A review of the record indicates there was substantial evidence supporting the jury's action in rejecting the defendant's claim of insanity. Defendant's own witness, Doctor Campanella, stated with regard to defendant's behavior on the night of October 18, 1975: "In my opinion he was aware of what he was doing." Another of the defense witnesses, Doctor Jack R. Anderson, admitted that other experts with education similar to his might come to an opposite conclusion than he did based upon the same tests that he used.

The State's medical witnesses testified the defendant knew what he was doing, could distinguish between right and wrong, and knew he deserved punishment at the time of the crime. Doctor Kenny, a physician and psychiatrist, found that defendant had a normal functioning I.Q., which is the measurement of how a man functions in daily life as opposed to how he functions on tests. He testified defendant knew the nature and quality of his acts; he knew they were wrong; he knew he would be punished; and he was able to distinguish at the time of those acts between right and wrong. On the record, the jury could find, as it did, that the defendant was responsible for his criminal activity.

Defendant's last assignment is directed to the exclusion of his former wife's opinion. Mrs. Olson, his ex-

wife, had no contact with him after 1967, or 8 years before the crimes charged. The defendant made an offer of proof to the effect his ex-wife would testify that in his right mind he could not have performed the acts charged. The State objected to the offer of proof for the reason that her opinion would relate to observations made prior to 1967.

The objection was properly sustained because the witness had no contact with the defendant after 1967. It is apparent her observations would be too remote to give an opinion as to his conduct on October 18, 1975. The foundation was insufficient to permit the witness to give her opinion as to the defendant's ability to commit the acts on October 18, 1975. A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the individual has personal knowledge of that matter.

We have attempted to answer in detail each of the defendant's assignments, and some of the other questions they raise. A careful review of the record indicates to us that the sentencing judge gave careful consideration to each and every aggravating and mitigating factor pertaining to these offenses. As previously stated, we conclude that he correctly found the aggravating factors considerably outweigh the mitigating factors. We find from our review of the record that the sentence imposed is not improper or excessive under the law.

We further find that the Nebraska statute does not violate any of the provisions of the state or federal Constitutions. We determine that the several provisions of the challenged statutes are clear and unequivocal, and are not vague and indefinite as contended by the defendant. In order to further pin the provisions down beyond any chance for misconception, we incorporate herein the pertinent rules enunciated in State v. Holtan, *ante* p. 544, 250 N. W. 2d 876, State v. Rust, *ante* p. 528, 250 N. W. 2d .867, and State v. Stewart,

*ante* p. 497, 250 N. W. 2d 849. These four cases have been considered in comparison to each other, and we sustain the death penalty in three of them.

The judgment of the District Court is affirmed.

AFFIRMED.