STATE OF NEBRASKA, APPELLEE, V. WESLEY H. PEERY, APPELLANT.

261 N. W. 2d 95

Filed December 28, 1977. No. 40967.

Stanley D. Cohen and Donald R. Hays, for appellant.

Paul L. Douglas, Attorney General, and Paul W. Snyder, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

WHITE, C. THOMAS, J.

On June 6, 1975, the body of Marianne Mitzner was found by her son in a bathroom at the rear of the Mitzner Rare Coin Shop, 6106 Havelock Avenue, Lincoln, Lancaster County, Nebraska. Mrs. Mitzner's hands and feet were tied. An autopsy disclosed that Mrs. Mitzner died as a result of three gunshots to the head, any one of which could have been fatal. One of the shots had its point of entry inside the mouth of the victim. The defendant, Wesley H. Peery, was arrested for the crime and pled not guilty to two counts, murder in the first degree and robbery. A jury found the defendant guilty of each of the counts. A sentencing panel consisting of the trial judge and two judges appointed by the Chief Justice, pursuant to law, sentenced the defendant to death for count I. The trial judge sentenced the defendant to a term of not less than 16 nor more than 50 years on count II to run consecutively to the sentence imposed on count I. The defendant appeals.

The defendant assigns four separate errors. Three of the assigned errors relate to the sentencing of the defendant on count I and the fourth only to the con-

duct of the trial itself. That assignment is as follows: "Misconduct on the part of the prosecuting attorneys denied the defendant his constitutional right to a fair trial." The defendant in his brief argues that the evidence was not sufficient to sustain convictions for the crime of first degree murder and robbery. We shall consider the argued error, even though the same was not assigned, in view of the gravity of the crime charged and the penalty imposed.

Essential to an understanding of this issue is a recitation of the facts offered in evidence at the trial. The evidence established that after leaving her home, the victim Marianne Mitzner was observed going toward her coin shop between 9 and 9:30 a.m. on June 6, 1975. A number of witnesses testified that the coin shop was open at various times in the morning of June 6, 1975, but no one saw Mrs. Mitzner. Ronald Svehla testified that he went into the Mitzner Rare Coin Shop at 10 a.m., stayed in the store 40 minutes, until approximately 10:40 a.m., and did not observe Marianne Mitzner. He did not go to the rear of the store. Richard Barnes testified that he went into the store at 10 a.m. with the witness Svehla, stayed 1½ hours, until 11:30 a.m., and never saw Mrs. Mitzner. He did not go to the rear of the store. Joanne Biggerstaff and Ronald Biggerstaff testified they were in the store at approximately 10:30 a.m., stayed 15 minutes, came back just after 11:07 a.m., stayed a short time, and did not see Marianne Mitzner. The pathologist, Dr. Robert F. Shapiro, performed an autopsy on the victim and concluded that death occurred between 9 a.m. and 10:30 a.m.

At the time of the murder, defendant, Wesley H. Peery, was an employee of Nebraska Wesleyan University. His supervisor, Darwin Penrod, testified that on the day of the murder the defendant was sent to the Action Locksmiths, 6214 Havelock Avenue, Lincoln, Nebraska. On the previous day, June 5,

1975, the defendant had taken a lock for repair to the Action Locksmiths and had been informed that the lock cylinder could not be repaired without the master key. It was for this purpose that the defendant was sent by his supervisor, the witness Penrod, to the Havelock area. Robert Schoonover, proprietor of Action Locksmiths, testified that he opened his locksmith shop about 9:15 a.m., and that he left for a service call at 9:45 a.m. and returned at approximately 11:05 or 11:30 a.m. He testified that when he returned from the service call, he observed the Nebraska Wesleyan lock, which previously had been locked, lying open on the bench. He testified that he did not know who brought the key to open the lock. The evidence was offered by the State to show that the defendant was in the area of the murder scene at or during the time when Marianne Mitzner met her death.

The victim's husband, who was in custody on June 6, 1975, testified that on that date he was notified of his wife's death and taken to the coin shop to make a partial inventory for police purposes. Among the items missing were a number of watches taken from a display case in the store proper, approximately $400 in cash, and 21 boxes of coins from a safe, including approximately 600 quarters, 600 half dollars, 350 silver dollars, 250 Canadian half dollars, 250 Canadian silver dollars, roughly 200 foreign coins, and a roll of 1962 uncirculated silver dollars. Mr. Mitzner further testified that in the operation of the coin store, he made use of an ultrasonic cleaning device whereby dirt or foreign substances within the natural crevices and scratches in a coin were removed by use of sound waves. He stated that he had covered some of the coins with a coat of lacquer.

Evidence discloses that on June 6, 1975, the defendant, Wesley H. Peery, was living with and at the apartment of one Mary Blazek. A witness, Nathan Bernstein, testified that on May 23, 1975, he sold an

RG .22 caliber revolver to Mary Blazek. Mary Bla-
zek testified that the gun disappeared after about a
week. She testified that the gun had been purchased
to defend herself against the threats of a former hus-
band. Later, the instruction book for the gun and
the warranty card were found in the defendant's own
apartment. The gun has never been recovered.

A witness, Vernon W. Byler, an investigator for
the Nebraska State Patrol, testified that an RG .22
caliber revolver had eight lands and grooves with a
right-hand twist for rifling. He also testified that
one of the metal fragments removed from the brain
of Marianne Mitzner had four lands and grooves and
because the fragment appeared to be half of a .22
slug that, in his opinion, it came from a gun with
eight lands and grooves. It appeared to be fired
from a gun with a right-hand twist. The gun pur-
chased by Mary Blazek, whose instruction book was
later found in the defendant's apartment, was such a
gun.

A witness, Sam Bitkower, testified that he had
sold several Enicar watches to Kenneth Mitzner, the
operator of the Mitzner Rare Coin Shop. Mr. Bit-
kower also testified that he had sold other Enicar
watches to Stevens Jewelers in Lincoln, but Stevens
Jewelers had gone out of business in August of 1974;
he had since observed Enicar watches on sale at the
Rare Coin Shop. On the morning of the crime, a
witness, Mr. Ronald Biggerstaff, noticed that watches
were missing and when Mr. Mitzner inspected the
Rare Coin Shop after the crime, he also noticed that
watches from his store had been taken. On June 27,
1975, an Enicar watch tag was found in the defend-
ant's car. The previous owner of the defendant's
Cadillac automobile testified that she regularly
cleaned the car and that to her knowledge there had
not been an Enicar watch tag in the car while she
and her husband owned it.

In a search of the Mary Blazek apartment, an am-

munition box was found on the floor of a closet covered with clothes. The ammunition box was opened by a key on the defendant's key chain. After the ammunition box was opened, it was found to contain two quarters on the top tray and a can of stain and a small grease can. The small grease can contained 139 quarters. Later these coins were found to be of the type stolen from the Rare Coin Shop. Upon examination by Mr. Mitzner, some of these coins were shown to be lacquered and some had been ultrasonically cleaned. Mr. Mitzner said, in his opinion, the coins were from the Rare Coin Shop. Darwin Penrod, superintendent of building and grounds for Nebraska Wesleyan University, testified that the ammunition box was of the type used by the defendant in his employment. Mr. Penrod also testified that the can removed from the ammunition box was one similar to cans they had in their work area and that there was no longer a can like it in the work area.

The victim's body had been tied with a rope or cord. The rope was examined scientifically and found to be identical to rope found at the defendant's place of work. Harold Deadman, a special agent of the F.B.I., testified that the rope used to tie Marianne Mitzner could have originated from the same roll as that found in the Nebraska Wesleyan boiler plant and that the type of rope was of an unusual nature. An attempt to buy rope of a similar type in the Lincoln area by Lincoln police was unsuccessful.

A rag was found at the scene of the crime. The witness Deadman examined this rag and compared it with rags found at the defendant's place of work. He testified that the rags were of the same weave and color. In his opinion, the rags probably originated from the same source. Mr. Mitzner later testified that he did not use rags of the type found. The rag was identified by Robert Allen, whose business distributes such rags, as having its origin from a rag

company located in the Eastern United States. Ne-
braska Wesleyan University was a customer for the
rags of this witness. The rags were of the identical
type found at the scene and a large supply of which
was still on hand at the Nebraska Wesleyan Univer-
sity campus.

When Marianne Mitzner was found dead, a gag
had been placed on her mouth. The gag used on the
victim was analyzed and found to contain human
blood. The blood was analyzed and determined to
be "B" type. The gag also had an "A"-type se-
creter on it. The evidence indicates that the defend-
ant Peery was an "A"-type secreter and that the se-
cretion contained on the nonblood portion of the rag
was due to the sweat or saliva of an "A"-type secre-
ter. A secreter, the evidence shows, is a person
whose saliva or perspiration reveals the blood type
of the person secreting. Not all persons are secre-
ters but the defendant was established to be a secre-
ter.

The stolen quarters were of silver, a type not is-
sued in the United States after 1964. After the rob-
bery and murder, coins were discovered in vending
machines in places where the defendant frequented:
The Villager Motel in Lincoln, Nebraska, where the
defendant had worked for 5 months; Matthews Tex-
aco where the defendant was a customer; the Treas-
ure City gas station where the defendant was an old
customer; and in Mary Blazek's apartment. In ad-
dition, a witness, Mark Mercier, testified that on
June 12, 1975, he approached two persons on the Ne-
braska Wesleyan campus and asked them for
change for a dollar. One of the persons, an Orville
Rielly, stated that he did not have any change but
the defendant, Wesley H. Peery, identified as that
person by Orville Rielly and the witness Mercier,
gave the witness Mercier four quarters. The quar-
ters were silver. Mercier, who is a collector, recog-
nized them as such and kept them. All the silver

coins recovered from the various sources, from Mark Mercier, and the apartment of Mary Blazek, were testified to as the type that were taken from the Rare Coin Shop.

A witness, Charles Graham, testified that at a time prior to the crime he and the defendant went for a ride in the defendant's car, and that the defendant asked the witness Graham for a gun. The defendant stated to Graham that he was tired of being broke and that he wanted to pull off "a big job."

When arrested, the defendant surrendered a pocketknife. The pocketknife was found to have both cotton and synthetic fibers on the blade. The rope with which Mrs. Mitzner was tied and the rope at the Nebraska Wesleyan campus also contained cotton and synthetic fibers. The defendant denied the crime and hypothesized that a Mr. Joe Cannito might have committed the crime. The defendant further testified that Mr. Cannito made a loan to him of $43 in quarters. The witness Cannito denied ever making such a loan.

The jury was in a position to weigh the evidence both for and against the defendant. The jury's finding of the defendant's guilt is amply sustained by the evidence. "In determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence. * * *

"In a criminal action, this court will not interfere with a verdict of guilty based on conflicting evidence unless, as a matter of law, the evidence is so lacking in probative force that it is insufficient to support the finding of guilt beyond a reasonable doubt." State v. Allen, 198 Neb. 755, 255 N. W. 2d 278.

To justify a conviction on circumstantial evidence, it is necessary that the facts and circumstances essential to the conclusion sought must be proved by competent evidence beyond a reasonable doubt, and,

when taken together, must be of such a character as to be consistent with each other and with the hypothesis sought to be established thereby and inconsistent with any reasonable hypothesis of innocence. State v. Earlywine, 191 Neb. 533, 215 N. W. 2d 895.

The evidence offered is totally consistent with the guilt of the defendant Wesley H. Peery. Other than a denial of the crime and an explanation for the presence of coins found in the locked ammunition box in Mary Blazek's apartment, which explanation was denied by a prosecution witness, the defense offers only a hypothesis as to how the crime may have been committed. Obviously, the jury was fully justified in finding the defendant guilty of the crimes charged and the evidence offered is sufficient to exclude any reasonable hypothesis other than guilt of the defendant. The evidence supports the finding of the jury.

The defendant next assigns as error a statement made by the county attorney immediately prior to the State's final rest on rebuttal. A specific question was asked of the court by the county attorney: "Your Honor, do I understand the rule of the Court correctly that if I testify in this case I can no longer participate." The court answered in the affirmative. The question was objected to by defense counsel. The objection was sustained and the jury was instructed to disregard the comment of the county attorney.

The remark was made during the State's presentation of rebuttal testimony. The next to last witness for the defense had been the defendant Wesley H. Peery. During the cross-examination, the county attorney asked the defendant questions concerning certain conversations he had had with the county attorney in the office of the county attorney. Some of the questions were answered in the affirmative by the defendant. Some of the alleged conversations were denied. The defense rested and the State

called as a rebuttal witness a police officer, who had previously testified, and who testified as to certain conversations he had had with the defendant in the Lincoln police department. It was at the conclusion of the extended examination and cross-examination of this witness that the county attorney addressed the remarks just cited to the court. The defendant now contends that in spite of the court's sustaining his objection and the instructions to the jury to disregard the statement, the remark was nevertheless prejudicial and denied the defendant a fair trial. It is the argument of the defendant that the remarks could only be interpreted as an assertion by the county attorney that, if permitted to testify, he would contradict statements made by the defendant on cross-examination and had the effect of informing the jury that if he, the county attorney, had been permitted to testify, he would contradict the defendant.

Assuming that a reasonable juror would place such a construction on the statement by the county attorney, were the remarks prejudicial to the right of the defendant to receive a fair trial? We conclude that the remarks were not prejudicial. In State v. Blockton (Mo. App., 1975), 526 S. W. 2d 915, a case cited by the State, the defendant was being tried on three counts of first degree murder and one count of assault with intent to kill. The prosecutor at one point during the trial stated: "I wish I could; if I could testify, we wouldn't be trying this case." The defense counsel objected. The court sustained the objection and the jury was instructed to disregard the statement. On appeal, the Court of Appeals of Missouri held that where the trial court did sustain the objection and instructed the jury to disregard the remarks, and the failure to declare a mistrial was not error. The Missouri court stated: "We have considered Chapman v. California, 386 U. S. 18, 24-25, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), and Bru-

ton v. United States, 391 U. S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), and do not believe that these cases require the declaration of a mistrial under these circumstances." The trial judge unequivocally sustained the defendant's objection and instructed the jury to disregard the prosecutor's remark. We feel this was sufficient to cure the error. Even assuming the defendant's contention to be true, we are unconvinced that if, in fact, any error took place, it was prejudicial and we hold that the error, if any, was promptly cured by the action of the trial court. We find no merit in defendant's contention.

At the conclusion of the trial, a verdict of guilty being received by the trial court, two additional judges, along with the trial judge, proceeded to hold a hearing pursuant to section 29-2521, R. R. S. 1943, for the determination of the sentence. The additional judges were designated by the Chief Justice of the Supreme Court after receiving a request therefor from the presiding judge. Evidence was presented and the court made findings of the aggravating and mitigating circumstances required in section 29-2523, R. R. S. 1943.

Section 29-2522, R. R. S. 1943, provides that in determining whether the sentence shall be fixed either at death or life imprisonment "such determination shall be based upon the following considerations:

"(1) Whether sufficient aggravating circumstances exist to justify imposition of a sentence of death; or

"(2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances."

Section 29-2523, R. R. S. 1943, defines the aggravating circumstances in eight categories and the mitigating circumstances in seven categories. The sentencing panel, pursuant to the command of the statute, made written findings, based on the records of the trial and the sentencing proceeding, and referred

to the aggravating and mitigating circumstances involved in its decision.

We will consider the aggravating and mitigating circumstances found by the trial court in the order set forth in section 29-2523, R. R. S. 1943, and the objections of the defendant thereto.

Before proceeding, however, we note that the proceedings before the three-judge panel took place before our decisions upholding the constitutionality of the Nebraska Death Penalty Act, sections 29-2519 to 29-2546, R. R. S. 1943, were decided. In those cases, State v. Holtan, 197 Neb. 544, 250 N. W. 2d 876, State v. Rust, 197 Neb. 528, 250 N. W. 2d 867, State v. Simants, 197 Neb. 549, 250 N. W. 2d 881, and State v. Stewart, 197 Neb. 497, 250 N. W. 2d 849, the Nebraska Death Penalty Act was reviewed and found, by an unanimous court, to be constitutional. Defendant's counsel contends that the aggravating and mitigating circumstances contained in section 29-2523, R. R. S. 1943, are unconstitutionally vague and indefinite. The contentions raised by the defendant were discussed in State v. Simants, *supra*, were rejected, and will not be discussed further.

We further note that under the command of the four death penalty cases: "This court will, upon automatic review in capital cases, compare the case under consideration with other capital cases and determine in each instance whether the death penalty is disproportionate." State v. Rust, *supra*. We have compared the circumstances involved in each of the previous four cases decided under the Nebraska Death Penalty Act with the facts in this case and with one another. See, State v. Holtan, *supra*; State v. Rust, *supra*; State v. Simants, *supra*; State v. Stewart, *supra*. We have not found the imposition of the death penalty in this case to be a disproportionate sentence in relation to the above cases. The crime committed in State v. Holtan, *supra*, was similar to the one at issue here. Defendant entered a

business premises, robbed the person in charge of a considerable sum of money, and shot and killed this person at close range while the victim was of no threat to the defendant. In State v. Holtan, *supra*, four aggravating and no mitigating circumstances were found applicable to defendant. This is clearly in contrast to State v. Stewart, *supra*, the only case where the imposition of the death penalty was found to be inappropriate. In State v. Stewart, *supra*, two mitigating circumstances were found as opposed to a single aggravating circumstance.

Defendant makes two further assignments of error with respect to the sentencing proceedings. The first is that it is unconstitutional to apply the death sentence to a defendant who is convicted by circumstantial evidence. The defendant does not discuss the assignment in his brief nor does he cite any authority for that proposition. The circumstances proved were sufficient for the jury to have found the defendant guilty of the crime of first degree murder. The facts were resolved against him by the verdict of the jury by ample evidence. Those facts inhere in the verdict and are proved beyond a reasonable doubt. Defendant's contention is without merit.

The final assignment of error alleges that the sentencing panel committed reversible error in misapplying the aggravating and mitigating circumstances with respect to the defendant. As noted above, the panel considered this matter prior to our opinions in the death penalty cases and did misapply, according to those opinions, certain factors which this court suggested were not appropriate in the determination of aggravating circumstances. We shall apply the standards set forth in those cases to the findings of the panel and weigh anew the aggravating and mitigating circumstances.

The evidence at the sentencing hearing consisted of the presentence investigation report and the testimony of a state patrol officer and a police officer of

the City of Lincoln. An exhibit was received in evidence consisting of a letter purportedly written by defendant, after his conviction, in which the defendant proposed a plan whereby $12,000 in coins would be offered to help recruit five men to enable the defendant to escape from custody. The evidence of the escape plan was received by the panel as indicating an intent or disposition of serious assaultive or terrorizing criminal activity. Such evidence was not properly received by the panel in a sentencing hearing since the term "substantial history of serious assaultive or terrorizing criminal activity" within the meaning of aggravating circumstance subsection (1)(a) of section 29-2523, R. R. S. 1943, does not include events or occurrences which are part of the circumstances surrounding the current charge but refer solely to earlier acts. See State v. Rust, *supra*. Under the previous holding of this court, such evidence, since it did not relate to an earlier act, should not have been received by the panel and will not be considered by this court in reviewing the sentence. The evidence then consisted of the report of the presentence investigation, and the admissible evidence introduced at the trial. The presentence investigation report consists of a history of the investigation of the Mitzner murder and prior juvenile and criminal history of the defendant, including reports of statements made by him to the state probation officer and to in-take officers at the various penal institutions in which the defendant has been incarcerated. The record reflects that the defendant and his counsel were each asked by the sentencing panel at the sentencing hearing whether they wished to correct or point out any inconsistencies in the presentence investigation report and were given an opportunity to do so. In each case the defendant and his attorney declined to do so. The defendant did not take the stand to refute

any of the statements or records contained in the pre-sentence investigation report.

The sentencing panel considered the following criminal history of the defendant which is supported by the presentence investigation report. The defendant has no previous murder convictions. In 1947 the defendant was convicted of the felony offense of escape from custody. Such act, admitted to by the defendant, involved forcible detainer and robbery of the jailer. The following year the defendant was convicted of armed robbery. During this robbery, the defendant and his accomplice, who both wore masks and carried guns, forcibly robbed a service station attendant and a customer who entered the station. Defendant now denies he participated in this robbery; however, in an in-take statement at the Nebraska State Penitentiary, the defendant admitted participation and the use of a gun. The sentencing panel correctly observed that the jury's verdict of guilty is binding on the panel, there being no credible evidence to the contrary. The defendant was sentenced to a 10-year term in the Nebraska State Penitentiary for the armed robbery.

Within 4 months of defendant's release in 1955 from serving the above sentence, he was arrested and subsequently convicted for burglarizing and obtaining a gun from the home of the assistant chief of police of Lincoln, Nebraska. Shortly thereafter, before the defendant was brought to trial on the charges stemming from the above incident, the defendant was tried and convicted for forcing a woman off the highway and raping her at gunpoint. A 10-year sentence was imposed for this crime. Since the Supreme Court of Nebraska reversed the rape conviction for lack of corroboration, the panel was correct in not considering such conviction in evaluating the existence of aggravating circumstance (1) (a).

During the trial on the burglary incident of the assistant police chief's home, a neighbor of the chief

testified that defendant had robbed her and her husband on the same day of the burglary in their home, using a snub-nosed revolver. She identified the defendant. The defendant was released on bond on August 13, 1957, while the burglary conviction was on appeal to the Nebraska Supreme Court, which later affirmed it.

On September 22, 1957, while out on bond, the defendant stole an automobile in Columbus, Ohio, where he had arrived 10 days previously. During the ensuing days, the defendant committed at least three robberies carrying a sawed-off shotgun to which robberies he pled guilty and received sentences of 30 to 75 years in the Ohio penitentiary. Again using a sawed-off shotgun as the threatening instrument, defendant robbed and raped a 7½-month pregnant woman in her home. He entered a plea of guilty to the robbery charge and admitted the rape charge. Defendant stated that he purchased a shotgun shortly after arriving in Ohio, committed the robberies for "easy money," and as well admitted the rape to Ohio prison officials. The presentence investigation report contains a statement of the defendant that there were a lot of robberies in Ohio, 26 in all, that "he was along on some, but not all."

On January 16, 1958, while making a court appearance in the Ohio cases, the defendant crawled through a transom in the security holding room, whereupon he proceeded to the roof of the courthouse. Wielding a 2-foot by 4-foot board procured from the roof, the defendant entered the courthouse library. He hit the librarian in the head which resulted in a slight injury.

The sentencing panel found that: "Throughout, and as late as November 16, 1972, defendant showed no remorse for the Ohio crimes nor is there any indication in the presentence report that the defendant has ever shown any remorse for any of the crimes which he has committed. All of the crimes for

which defendant was convicted were cold, calculated and premeditated.''

The sentencing panel also pointed out that the defendant is 51 years of age and that of these 51 years, 33 years and 10 months have been spent in jail or prison. He has been free only 2 years, 8 months, and 11 days since the initial incarceration. The sentencing panel concluded: ''The total criminal record and history of defendant as shown by the presentence report establishes substantial convictions of crimes involving the use of, or threat of violence to the person, and as constituting a substantial history of serious assaultive or terrorizing criminal activity within the meaning of the statutory definition.'' We agree with the sentencing panel that aggravating circumstance (1) (a) does exist.

Section 29-2523 (1) (b), R. R. S. 1943, reads: ''The murder was committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of the crime.'' The presentence investigation report and evidence reveal that the defendant had been in the coin store prior to the robbery. The victim knew her assailant by name and could recognize his physical features. Prior to her murder, Mrs. Mitzner had been tightly bound and gagged. She posed no threat to the defendant for some period of time. We agree with the sentencing panel that the ''only conclusion that can logically be reached is that Mrs. Mitzner was murdered to conceal the identity of the defendant, the perpetrator of the crime of robbery, and to, for at least a period of time, conceal the commission of the robbery.'' Therefore, aggravating circumstance (1) (b) does exist.

Section 29-2523 (1) (c), R. R. S. 1943, reads: ''The murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant.'' The sentencing panel correctly stated: ''A portion of this circumstance is

intended to apply to murder actually committed by another at the instance and request of the defendant. This murder was not so committed.'' However, the sentencing panel went on to hold that ''the defendant did commit it as a part of the robbery, which robbery was for pecuniary gain of the defendant. This aggravating circumstance exists, but only insofar as the robbery itself contributed to the pecuniary gain of the defendant.'' We disagree. ''A murder is committed for pecuniary gain when the murder itself is motivated primarily by desire for pecuniary gain as in the case of a murder of an insured by the beneficiary of a life insurance policy for the purpose of obtaining the proceeds.'' State v. Rust, *supra*. Here, this aggravating circumstance does not exist.

Section 29-2523 (1) (d), R. R. S. 1943, reads: ''The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence.'' The scope of this circumstance has been discussed and interpreted by this court. In State v. Rust, *supra*, this court approved the interpretation and finding of the sentencing panel regarding this circumstance: '' 'We recognize that all first degree murder crimes are capable of being accurately characterized by one or more of the descriptive adjectives employed, but by the use of the words ''especially'' and ''exceptional'' the legislature has required a much greater degree of these characteristics than is usually present in a murder. This category of aggravating circumstances would include murders involving torture, sadism, sexual abuse, or the imposition of extreme suffering. Here the murder was effected by three bullets causing almost instantaneous death and the imposition of extreme suffering of the victim was not involved. It is a close question as to whether this particular aggravating circumstance exists. In view of our foregoing interpretation of the application of this aggravating circumstance, we

find this aggravating circumstance does not exist.' "
Here, the evidence establishes that the defendant
fired three gunshots, any one of which could have
killed Mrs. Mitzner. Instantaneous death was the
probable result. While placing a gun in the victim's
mouth and firing would involve torture to the victim,
the victim may already have been dead when this
atrocity was committed. There is no evidence as to
which shot was fired first. However, while this
probability would negate the element of torture, an
attack on a body after death may be considered in
evaluating the existence of this circumstance. See
State v. Simants, *supra*.

Furthermore, we said in State v. Rust, *supra*, that
aggravating circumstance (1) (d) exists "where
the murder is so coldly calculated as to indicate a
state of mind totally and senselessly bereft of regard
for human life." Here the defendant fired the shots
when the victim was thoroughly and effectively
bound, both wrists being tied tightly behind her, and
her ankles tightly tied; she was not offering any re-
sistance, posed no threat to the defendant, and was
totally helpless. The victim was shot once between
the eyes, once in the right temple, and, as mentioned
above, once when the mouth was open, the gun
thrust into her mouth, and a bullet was fired into the
roof of the mouth directly into the brain.

This court agrees with the sentencing panel that
"these facts conclusively show that the defendant
deliberately murdered Marianne Mitzner; that he
did so premeditatively, purposely, and with a shock-
ing display of maliciousness and ruthlessness." Ag-
gravating circumstance (1) (d) does appear.

Section 29-2523 (1) (e), R. R. S. 1943, reads: "At
the time the murder was committed, the offender
also committed another murder." The District
Court held this aggravating circumstance does not
exist. We agree.

Section 29-2523 (1) (f), R. R. S. 1943, reads: "The

offender knowingly created a great risk of death to at least several persons." We agree that this circumstance does not exist.

Section 29-2523 (1) (g), R. R. S. 1943, reads: "The victim was a law enforcement officer or a public servant having custody of the offender or another." We agree that this circumstance does not exist.

Section 29-2523 (1) (h), R. R. S. 1943, reads: "The crime was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws." We agree that this circumstance does not exist.

As to mitigating circumstances, we find: Section 29-2523 (2) (a), R. R. S. 1943, reads: "The offender has no significant history of prior criminal activity." In evaluating the applicability of aggravating circumstance (1) (a), we set out in some detail the defendant's previous criminal history. It is substantial and indeed, significant. We agree with the sentencing panel's finding that "defendant's record constitutes a significant history of serious assaultive and terrorizing criminal activity" and that this mitigating circumstance does not exist.

Section 29-2523 (2) (b), R. R. S. 1943, reads: "The defendant acted under unusual pressures or influences or under the domination of another person." The evidence establishes that the defendant acted alone in committing the robbery. We agree with the sentencing panel that the "defendant was acting under pressures of being apprehended for the robbery and thus spending the rest of his life in institutions for criminal wrongdoing, but these pressures were of his own making in committing the robbery." This mitigating circumstance refers only to external pressures, not those a defendant chooses to create for himself. This mitigating circumstance does not exist.

Section 29-2523 (2) (c), R. R. S. 1943, reads: "The crime was committed while the offender was under

the influence of extreme mental or emotional disturbance.'' There has been no claim nor is there any evidence that the defendant was mentally or emotionally disturbed when he committed the murder. The actions of defendant prior to the crime reveal a deliberate plan. He entered the coin shop with a gun, rags, and rope. His goal was money. He implemented his plan with this single-minded purpose and an indifference to human life. This mitigating circumstance is absent here.

Section 29-2523 (2) (d), R. R. S. 1943, reads: ''The age of the defendant at the time of the crime.'' The defendant was 51 years of age. Youth or extreme age might mitigate the crime; here, in the absence of either of these factors, this mitigating circumstance does not exist.

Section 29-2523 (2) (e), R. R. S. 1943, reads: ''The offender was an accomplice in the crime committed by another person and his participation was relatively minor.'' The defendant was a lone actor in committing a major crime. We agree with the sentencing panel that this mitigating circumstance does not exist.

Section 29-2523 (2) (f), R. R. S. 1943, reads: ''The victim was a participant in the defendant's conduct or consented to the act.'' The sentencing panel found this circumstance does not exist. We agree.

Section 29-2523 (2) (g), R. R. S. 1943, reads: ''At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication.'' We agree with the sentencing panel that: ''No claim has been made nor has any evidence been adduced that the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication. The defendant did

not and does not drink alcoholic beverages and was not intoxicated at the time the crime was committed." This mitigating circumstance does not exist.

We find three of the aggravating circumstances are applicable and that sufficient aggravating circumstances exist to justify the imposition of a sentence of death.

We further find that none of the seven statutory mitigating circumstances is applicable and there are no mitigating circumstances to approach or exceed the weight given to the aggravating circumstances.

"In the balancing of the aggravating and mitigating circumstances, the death penalty will not be imposed simply because the aggravating circumstances may outnumber the mitigating circumstances. Rather, the test is whether the aggravating circumstances in comparison outweigh the mitigating circumstances." State v. Simants, *supra*. The aggravating circumstances found by the sentencing panel were sufficient for the panel to impose the death penalty.

We affirm the judgment of the District Court.

AFFIRMED.