STATE OF NEBRASKA, APPELLEE, v. HAROLD D. NOKES, APPELLANT.

224 N. W. 2d 776

Filed January 2, 1975. No. 39548.

James M. Kelley of Kelley & Thorough, for appellant.

Clarence A. H. Meyer, Attorney General, and Marilyn B. Hutchinson, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

McCOWN, J.

The defendant, Harold D. Nokes, pleaded guilty to one count of first degree murder for the killing of Wilma Hoyt, and one count of second degree murder for the killing of Edwin Hoyt. A three-judge panel imposed a sentence of life imprisonment on the charge of first degree murder. The presiding District Judge imposed a sentence of life imprisonment on the second degree murder count, and directed the sentences to run consecutively. This appeal followed.

The relevant facts of the killings are taken from a statement made by the defendant on January 4, 1974, in the presence of a court reporter; the special prosecutor; the defendant's counsel; and the sheriff of Frontier County. The statement is designated as exhibit A and included in the bill of exceptions.

Edwin and Wilma Hoyt disappeared from their farm home near Culbertson, Nebraska, on September 23, 1973. After a couple of days, their daughter, Kay Hein, suspected foul play and gave the police some information which set off the extensive investigation that followed. The defendant, Harold D. Nokes, was among those investigated.

The defendant, Harold D. Nokes, was 45 years of age. He was employed by the State Department of Roads as an area foreman in McCook, Nebraska. He and his wife, Ena, had been married for some 27 years and had lived for 20 years in their home at 903 East G Street in McCook. Harold and Ena Nokes had been mutual

friends of Mrs. Kay Hein and her husband, Dwayne, for several years.

At sometime in 1969 or 1970, Harold Nokes and Kay Hein became involved in a sexual relationship. In 1971, Mrs. Hein divorced her husband. Mrs. Hein then continued sexual relationships with the Nokeses until April or May of 1973. In April of 1973, Mrs. Hein attempted suicide and the defendant called her parents, Mr. and Mrs. Hoyt, and reported the incident to them. In May of 1973, Mrs. Hein broke off her relationship with the defendant. In June of 1973, Mr. Hoyt accused the defendant of attempting to blackmail Mrs. Hein and repeated the accusations on other occasions thereafter.

On Sunday, September 23, 1974, Harold Nokes and his wife left McCook at approximately 8 p.m., and decided to drive to the Hoyt's home near Culbertson to get the "misunderstandings straightened out." The defendant took a revolver along which he had purchased that summer, and put it in his belt under his coat. The defendant and Mrs. Nokes arrived at the Hoyt residence at about 8:30 p.m. After the four individuals had discussed the matter for a period of time, which is unclear in the record, the defendant suggested that the four of them go to the Nokes' house in McCook and have Mrs. Hein join them there. Mr. and Mrs. Hoyt agreed, and the defendant suggested that the Hoyts ride with him to McCook, and Mrs. Nokes followed in the Hoyt car.

When they arrived at the Nokes' residence in McCook, Mr. Hoyt had become angry and was talking loudly, and the defendant suggested that they all go to the basement so that the neighbors would not hear them. The four went to the basement. The defendant and Mr. Hoyt went into the wash room and the two women remained in the family room. The door between the two areas was open throughout the events. In the wash room, Mr. Hoyt said that he had had enough and he removed his glasses, drew his fist back, and came toward the defendant. The defendant took his gun out of his

belt when Mr. Hoyt was about 3 feet from him, fired one shot into Mr. Hoyt, and killed him.

Mrs. Hoyt came toward the defendant, started screaming, and said: "Why didn't you kill Kay," and then started up the basement stairs. The defendant stated that he "couldn't let her get away," and when she was about two steps up the stairs, he shot her in the back and she fell dead at the foot of the stairs.

Harold and Ena Nokes discussed the situation and decided to dispose of the bodies. The defendant dismembered the bodies with a butcher knife, and his wife helped wrap the pieces and put them in a freezer. She also took the Hoyt car to a hospital lot and left it. The activities consumed most of the night, and both Mr. and Mrs. Nokes went directly to work the next morning. During the day the defendant returned to his house and picked up the clothes he had been wearing and the clothes the Hoyts had worn and took them out and burned them. That evening, around sundown, the defendant and his wife loaded the body parts into the trunk of their car and into a boat which they pulled behind the car. They then drove to Harry Strunk Reservoir, also known as Cambridge Lake, put the body parts into the boat; put the boat into the water; boated out into the lake; unwrapped each body part; and threw it into the lake. They returned to shore, built a fire, and burned the wrappings. The following Saturday the defendant returned to the lake and found 7 or 8 pieces of bodies floating along the edge of the lake. He placed them in against the rocks along the dam and put another rock on top of them. The defendant never returned to the lake thereafter.

Harold D. Nokes was arrested on December 20, 1973. The reported statement was given on January 4, 1974. On January 10, 1974, the defendant waived the right to preliminary hearing and entered his plea of guilty to both counts of murder, after a full and complete arraignment. On March 22, 1974, after full presentence

reports, the three-judge panel imposed a life sentence on the first degree murder count; and the presiding District Judge imposed a consecutive life sentence on the second degree murder count.

The defendant's first general area of complaint is directed at the voluntariness of the defendant's guilty plea and the alleged lack of any factual basis to establish premeditation on the first degree murder count. It is somewhat difficult to comprehend the basis of these contentions. The arraignment was extensive and thorough. The agreement and understanding under which the statement of January 4, 1974, was obtained was fully and thoroughly explained to the defendant and to the court. The defendant does not even intimate that the statement of January 4 was illegal, improper, or even involuntary. Essentially, the argument seems to rest on the contention that the statement of January 4 fails to establish a factual basis of premeditation as to the first degree murder count.

In State v. Hall, 188 Neb. 130, 195 N. W. 2d 201, we held that the standard for determining the validity of a guilty plea is whether or not it represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. See North Carolina v. Alford, 400 U. S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162. Not only was the plea here a clearly voluntary and intelligent choice among alternative courses of action, there was also ample evidence to establish that the murder of Mrs. Hoyt was premeditated. The defendant's own admission establishes the necessary foundation. He said: "But as soon as I shot him, well, she started running for the stairs, and all I could think of, I couldn't let her get away and she was past me and I shot her."

While the time may have been short, it is nevertheless clear in this state that time is not the crucial element in establishing premeditation. Almost three-quarters of a century ago, this court said: "It is earnestly insisted that time is required for premeditation and delibera-

tion. While this is true, the time required may be of the shortest possible duration. The time may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed * * *." Savary v. State, 62 Neb. 166, 87 N. W. 34. There can be no doubt that on the basis of the defendant's statement alone, there was a factual basis for the plea of guilty to first degree murder. If there were any real doubt as to the voluntariness of the defendant's statement, merely a cursory glance at the statement itself would dispell any doubt. On at least two occasions the defendant expressed a desire to get everything taken care of as quickly as possible and to have it over with. The guilty plea here represents the defendant's own free voluntary and intelligent choice among the alternative courses of action open to him.

The next major group of assignments of error centers around the contention that the defendant was denied the effective assistance of counsel. The contention embraces charges of incompetence for failing to file motions to suppress evidence resulting from an illegal search and seizure; from illegal and improper electronic surveillance of his home; as well as failure to file motions to suppress some of defendant's statements given prior to the January 4 statement. The allegations of incompetence are concluded by the allegation that "his trial counsel allowed him to plead guilty." Carried to its logical extreme, that contention would mean that every defense counsel would be required to try every criminal case and make every possible defense, regardless of the strength of the evidence against the defendant and in disregard of the defendant's own desires; and to ignore the beneficial alternatives to trial afforded by a guilty plea. Obviously no court has ever adopted such a position.

It must be noted also that the misconduct charged here involved failure to file motions to suppress various

items of evidence which might have been admissible at trial. But this case was not tried, nor did any of the evidence at which the objections are directed enter into the defendant's conviction. The plea of guilty rendered all those other allegations completely irrelevant. This state, along with virtually every other state, has consistently held that a plea of guilty embodies a waiver of all defenses to the charge, whether procedural, statutory, or constitutional. See, State v. Mason, 187 Neb. 675, 193 N. W. 2d 576; Annotation, 20 A. L. R. 3d 724. The basis for that proposition was stated in Tollett v. Henderson, 411 U. S. 258, 93 S. Ct. 1602, 36 L. Ed. 2d 235, as follows: "We thus reaffirm the principle recognized in the Brady trilogy: a guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."

In Hughes v. United States, 371 F. 2d 694 (8th Cir., 1967), that court held that a voluntary plea of guilty admitted all the essential elements of the offense charged and waived all nonjurisdictional defects and defenses and said: "The plea of guilty established his guilt of the offenses charged. No proof of defendant's guilt by use of the seized evidence or any other evidence was required."

It has never been true that the competence of counsel in a criminal case can be proved only by an actual demonstration of his professional abilities in the legal arena of a trial courtroom. The knowledge, experience, judgment, and advice of counsel are more important than his dexterity in legal maneuvers, or the determination with which he wields the weapons of his profession in a jury trial. Here Harold D. Nokes' trial counsel performed at least as well as a lawyer with ordinary train-

ing and skill in the criminal law in his area, and conscientiously protected the interests of his client within the test standards set out in State v. Leadinghorse, *ante* p. 485, 222 N. W. 2d 573.

The final contention of the defendant is that the consecutive life sentences are excessive and an abuse of judicial discretion. It may well be that consecutive life sentences reflect a public policy of retribution and punishment to the maximum extent. There is no valid reason here why such a public policy should not be vindicated and the penalty of life imprisonment executed to its full extent. See State v. Pope, 190 Neb. 689, 211 N. W. 2d 923. Under the circumstances involved in the crimes here it cannot be said that the trial court abused its discretion in directing that the sentences be served consecutively. See State v. Rodman, *ante* p. 403, 222 N. W. 2d 109.

The judgment is affirmed.

AFFIRMED.