STATE OF NEBRASKA, APPELLEE, v. ROBERT E. WILLIAMS, APPELLANT.

287 N. W. 2d 18

Filed December 18, 1979. No. 42235.

Dennis R. Keefe, Lancaster County Public Defender, Thomas L. Hagel, and Richard L. Goos, for appellant.

Paul L. Douglas, Attorney General, and Judy K. Hoffman, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ., and RIST, District Judge.

McCOWN, J.

Robert E. Williams pleaded not guilty by reason of insanity or mental derangement to two counts of murder in the first degree and one count of first degree sexual assault. He was found guilty by a jury on all three counts and sentenced to death on each of the two murder counts and to imprisonment for not less than 8⅓ years nor more than 25 years on the sexual assault count.

In the late afternoon of August 11, 1977, the bodies of Patricia A. McGarry and Catherine M. Brooks were found in the McGarry apartment in Lincoln, Nebraska, after a search was instituted when neighbors found the 5-year-old daughter of Catherine Brooks wandering in the neighborhood looking for her mother.

The naked body of Catherine Brooks was found lying face down in the center of the living room floor. A pool of blood surrounded her head. There was a nonfatal bullet wound in her back and two bullet wounds behind her left ear. Later medical examination revealed spermatozoa in the vagina and in the rectal tract. The pathologist testified that the spermatozoa would have had to be deposited within an hour of her death.

The body of Patricia McGarry was lying in the dining room, face up, clad in a blue housecoat. She had also been shot three times, once under her right ear and twice in the neck. There was a bloody trail on the carpet from the living room into the dining room to the spot where Patricia's body lay.

The police found an empty beer bottle with latent fingerprints on a chair. Later examination estab-

lished the fingerprints as those of the defendant. The police also found a full box of .22 caliber long rifle shells on the coffee table in the living room and another unfired .22 caliber shell on the sofa. The casing of a .22 caliber shell was found on the floor of the living room. There was a bullet hole in the wall between the living and dining rooms, and a spent bullet was found in the entryway between the two rooms. Later investigation established that on August 10, 1977, at approximately 7:15 p.m., a model K-22 Smith & Wesson .22 caliber revolver and five boxes of .22 caliber long rifle shells were purchased by the defendant at a store in Lincoln.

Evidence at trial established that on August 11, 1977, at approximately 9:30 a.m., the defendant appeared at the apartment of another young woman in Lincoln, Nebraska. She had been acquainted with the defendant for approximately 6 months and he had been a babysitter for her 2-year-old daughter on occasion. The defendant told the woman that his car was broken down and asked to use her telephone. She admitted him and he then told her he needed to stay in her apartment for a while. She suggested that he stay in the storage room area of the apartment complex instead. The defendant then drew a revolver and demanded that she have sexual relations with him. She tried to lock herself in the bathroom but the defendant forced the door open and broke off the lock. He struck her in the chest and on the side of the head with the gun and threatened to blow her head off, and then raped her. The defendant remained in the apartment for several hours and raped the woman repeatedly.

At approximately 4 p.m., the defendant ordered the woman to bring her 2-year-old child and go to his car with him. As they approached the curb he told her she was free to go. She immediately went to a neighbor's home and called the police.

The woman testified that during the time the de-

fendant had been with her, he drank one beer and smoked a joint of marijuana but appeared normal and did not appear to be intoxicated. Other witnesses who had been with the defendant on August 10, and one as late as 1:30 a.m., on August 11, 1977, testified that on those occasions the defendant appeared normal in speech and actions and did not appear to be intoxicated, although he had been drinking.

The evidence at trial established that defendant left the woman's apartment in Lincoln about 4 p.m., August 11, 1977, and about an hour later was seen at a service station in Fremont, Nebraska, some 50 miles away, where he stopped and purchased gasoline. The station attendant testified that the defendant's speech and coordination appeared to be normal, although he smelled alcohol on the defendant's breath.

At approximately 10:15 p.m., on August 11, 1977, a deputy sheriff observed and checked the defendant's car at a park and rest area in Cherokee County, Iowa, and checked it periodically thereafter through the night. At 6:15 a.m., the deputy had the car towed away. Upon examination of the car, the deputies discovered a packaging box for a Smith & Wesson K-22 revolver; a box of .22 caliber long rifle cartridges from which six cartridges had been removed; a bag of marijuana; and some gas cans with negroid hairs on them.

Shortly after 6 a.m., on August 12, 1977, Mrs. Jack Montgomery, who lived 1½ miles west of the park and rest area in which defendant's car had been found, discovered that her car was missing from the garage. There was a blanket in the car and another blanket was also missing. She also found a checkbook with the name of the defendant imprinted on the checks lying in the driveway in front of the garage. At approximately 10 o'clock the same morning the Montgomery car was found abandoned in a

ditch about 20 miles northeast of the Montgomery farm.

A little after 7 a.m., on the same morning, Elbert Bredvick was standing in his farmyard approximately 5 miles southwest of the point at which the Montgomery car had been abandoned. Bredvick observed the defendant approaching carrying two blankets draped over his shoulder. The defendant asked for directions to the nearest town. Bredvick gave the defendant directions which led defendant past the Wayne Rowe farmhouse one-half mile to the west, and the defendant departed in that direction.

On the morning of August 12, 1977, Mrs. Wayne Rowe left the farm home at 7:45 a.m., for an appointment at her hairdresser. Wayne Rowe left the house about 8:15 a.m., and returned shortly after noon, expecting his wife to be home. He observed that his wife's car was gone and when he entered the house he saw his wife's purse on the chair and the morning mail on the table. About that time an Iowa state trooper arrived and Rowe and the trooper went upstairs and found Mrs. Rowe's naked body on the bed. There was a shotgun wound in her side and another in her back, and there was a wound in her neck from a .22 caliber bullet. Later examination established that she had also been sexually assaulted.

Negroid hairs were found in her hand and on the bedspread which compared favorably in diameter, coloration, pigment distribution, scale patterns, and medullation to samples taken from the defendant and the hairs found on the gas cans in his car. A .22 caliber bullet was found in the fibers of the bedspread which matched the bullets recovered from the bodies of Catherine Brooks and Patricia McGarry. A shotgun which had been kept in the Rowe home was missing and the telephone line had been cut.

In the bushes behind the Rowe garage officers

found the blankets which were identified by Bredvick as the blankets that had been draped over the defendant's shoulder earlier that morning. The Rowe car was found later in St. Paul, Minnesota. Inside the car was a live round of .22 caliber ammunition and a misfired cartridge with a firing pin impression which matched a casing found at the murder scene.

On August 13, 1977, at approximately 1:30 p.m., in a suburb of St. Paul, Minnesota, the defendant confronted Walter Behun at gunpoint in the Behun yard and ordered Behun to drive him to St. Paul. They drove around for some time, ending at a railroad freight yard, where the defendant tied Behun up with belts and a sweat shirt, gagged him, and left him in a caboose. Behun testified that the defendant did not appear to be intoxicated.

About 3 p.m., on August 13, 1977, a young woman was returning to her car in a parking lot in St. Paul, Minnesota. She opened the car door and placed her purchase on the floor. The defendant came up behind her and ordered her to get into the car or he would shoot her. Before she had time to do so, he shot her once in the arm and again later behind her left ear. The defendant pushed her into the car, demanded the keys, and drove to a remote country area where he raped her. After the assault, the defendant tied her hands and legs and drove off in her car. She managed to untie herself, got to a farmhouse and was taken to the hospital, where she ultimately recovered.

The evidence indicates that after August 13, 1977, the defendant went to Chicago, Illinois, and then back to Lincoln, Nebraska, where he was arrested in the railroad yards on the early morning of August 18, 1977.

The defendant made a statement to the police which was admitted in evidence, and also testified at trial. Essentially, the defendant admitted shooting

both Catherine Brooks and Patricia McGarry at the apartment in Lincoln, but denied raping Catherine Brooks. He testified that he was heavily under the influence of drugs and liquor at the time of the shootings and that his recollection was consequently very vague and confused.

On the issue of insanity raised by the defendant's plea, two psychiatrists testified for the prosecution, and both testified that although the defendant suffered from a personality disorder, he was not insane at the time of the murders and assault. Two psychiatrists for the defense testified that at the time of the crimes the defendant suffered from a paranoid state beyond that of a personality disorder. One testified that the defendant's perception of reality and his judgment were seriously impaired, but the doctor could not say the defendant did not know that what he was doing was wrong. The other doctor testified that the defendant's thinking process was distorted and that he would know his actions were wrong only if he took time to think. At the conclusion of the trial the jury found the defendant guilty on all three counts. A three-judge panel sentenced him to death on each of the two murder counts and to imprisonment for not less than 8⅓ years nor more than 25 years on the sexual assault count, and this appeal followed.

The defendant contends that the trial court erred in admitting evidence of crimes other than those with which the defendant was charged, and that the evidence of such crimes was inadmissible and prejudicial. The defendant argues that none of the evidence of subsequent crimes was needed to prove any of the elements of the crimes charged, and that there is no legal connection between such subsequent crimes and the crimes with which the defendant was charged. He relies on the general rule that evidence of other crimes is not admissible to prove the defendant guilty of the particular crime with

which he is charged. As an exception to that rule, this court has repeatedly held that evidence of other crimes similar to that charged is relevant and admissible when it tends to prove a particular criminal intent which is necessary to constitute the crime charged. State v. Casados, 188 Neb. 91, 195 N. W. 2d 210. In sexual assault cases evidence which tends to show a course of conduct, scheme, or design is admissible to prove identity, although such evidence relates to other offenses. State v. Walker, 200 Neb. 273, 263 N. W. 2d 454.

Section 27-404 (2), R. R. S. 1943, provides: "(2) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." See State v. Nielsen, 203 Neb. 847, 280 N. W. 2d 904.

Evidence of other crimes may be admitted in a criminal prosecution where the evidence is so related in time, place, and circumstances to the offense or offenses charged as to have substantial probative value in determining the guilt of the accused. Evidence which is not sufficiently related is excluded on the ground that the probative value is outweighed by the risk of undue prejudice. The question of probative value depends upon many considerations, including proximity in point of time and place, the character of the evidence, and all the surrounding circumstances. See Annotation, 92 A. L. R. 3d 545.

Sexual crimes have consistently been classified as a class of crimes in which evidence of other sexual crimes has been recognized as having independent relevancy. Recent cases recognize that the problem cannot generally be solved by virtue of a mechanical rule of relevancy but, instead, is one of balance.

McCormick on Evidence (2d Ed.), § 190, p. 447, at p. 453, states: "[T]he problem is not merely one of pigeonholing, but one of balancing, on the one side, the actual need for the other-crimes evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility."

The trial court noted that in this case the crimes charged must, of necessity, be proved by circumstantial evidence and inference because of the lack of an eyewitness or a complete detailed statement of the defendant. The trial court's ruling on the defendant's motion in limine to exclude evidence of other crimes specifically stated: "The issue of mental competency bearing on the intent of the defendant in committing the alleged crimes, the marked similarity of design and motive of the other crimes and the closeness of the time period make the admissibility of the other crimes strongly relevant and overcome the prejudice and accumulation of evidence which results therefrom.

"The court further finds that the evidence of the various stolen automobiles is necessary to trace the course the defendant followed between the alleged other crimes which in the court's judicial discretion are admissible."

Evidence of other criminal acts which involve or explain the circumstances of the crime charged, or are integral parts of an overall occurrence or transaction, may be admissible. State v. Nielsen, *supra.* The evidence of other crimes in the case now before us constituted a continuous chain of evidence detailing the course of defendant's flight, and the patterned course of criminal conduct which was an

integral part of it. The evidence of other crimes was relevant to prove motive, opportunity, and intent, and that relevance is greatly strengthened by the fact that all the other crimes occurred within a period of less than 72 hours after the crimes with which the defendant was charged. Not only was the evidence relevant on the issue of motive and intent, but it established plan, preparation, and a method of operation substantially similar, including the use of the same gun and the similar wounds in the neck and near the ear of the victims.

There was no abuse of discretion on the part of the trial court in admitting the evidence of other crimes here. The prejudicial effect on the defendant of the admission of the evidence of other crimes is clearly outweighed by the relevance of that evidence to prove the crimes with which the defendant was charged.

The defendant next contends that the photographs taken at the McGarry apartment in Lincoln and the Rowe farm in Iowa should not have been admitted because they were inflammatory, gruesome, and prejudicial, and that whatever relevance they may have had was outweighed by their prejudicial effect. We disagree.

Of the 22 photographs taken in Lincoln at the scene of the crimes charged, the majority of them were exterior and interior scenes showing only inanimate objects, and the defendant did not object to their admission. The defendant objected to the admission of seven photographs, only some of which might be said to be gruesome. Three of the photographs were of Catherine Brooks; one of the back of her head and showing a blood stain beneath it; the second was of her upper torso and back; and the third was a view of her entire body, partially obstructed by a chair. Two photographs of Patricia McGarry as found at the scene were admitted into evidence; one of the upper torso showing the blood-stained carpet and

book beneath her head; and the other of her entire clothed body. Two post mortem photographs of her, one a right view and the other a left view, were also admitted to show the location of wounds. Some cumulative photographs were not received into evidence and only three of the challenged seven photographs might reasonably be said to be gruesome.

The photographs of the Iowa crime scene are substantially similar in nature to those taken at the scene of the Nebraska crimes. The majority are exterior and interior scenes, showing only inanimate objects and are not gruesome. There were three photographs showing three different views of the victim's body. One showed the wound on her wrist, one showed the wounds on the left side of her head, and one showed the body as it was found, with the shotgun wound in the side. The three photographs showed the condition of the body and the nature and extent of the wounds. One additional photograph of the victim's body was excluded.

The admission of photographs of a gruesome nature rests largely within the sound discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect. State v. Freeman, 201 Neb. 382, 267 N. W. 2d 544. Although it is true that the probative value of gruesome photographs should be weighed against the possible prejudicial effect before they are admitted, if a photograph illustrates or makes clear some controverted issue in a homicide case, a proper foundation having been laid, it may be received, even if it is gruesome. State v. Partee, 199 Neb. 305, 258 N. W. 2d 634. In a homicide case, photographs of the victim, upon proper foundation, may be received in evidence for purposes of identification, to show the condition of the body, the nature and extent of wounds or injuries, and to establish malice or intent. State v. Dittrich, 191 Neb. 475, 215 N. W. 2d 637.

The photographs admitted here were relevant and of direct probative value in establishing the various elements of the crimes charged. The court did not abuse its discretion in admitting the photographs into evidence.

The defendant next contends that the trial court erred in refusing to sustain a motion for a change of venue. The defendant contends that because of extensive publicity in the news media, virtually all the residents of Lancaster County had knowledge of the case, and many had formed opinions as to the guilt or innocence of the defendant. The defendant therefore argues that he could not receive a fair trial, nor could possible prejudice be cured by extensive voir dire examination.

The trial court held a hearing on the motion for change of venue prior to trial, at which time the results of an opinion survey conducted by two professional poll researchers and other evidence as to the nature and extent of pretrial publicity were introduced. The trial court reserved ruling on the motion pending the final selection of the jury. Extensive voir dire on jury selection extended over a period of 5 days, and the trial court then denied the defendant's motion for change of venue.

The record establishes that 11 of the 12 jurors recalled little about the publicity they had heard or read, and none had formed an opinion on the issue of the defendant's guilt. The twelfth juror at first indicated an opinion concerning some elements of the case, but also indicated confusion as to the voir dire questions and later responded that she did not have any opinion one way or the other. Upon questioning by the court she stated that she did not have a fixed opinion and that she could set aside any impressions she may have gotten from publicity and decide the case fairly on the evidence given in the courtroom. All the jurors indicated that they believed they could be fair and impartial jurors.

The defendant takes the position that extensive pretrial exposure of jurors to information and news accounts as to the crimes with which the defendant was charged is sufficient, standing alone, to deprive him of due process. That conclusion is unfounded. See Murphy v. Florida, 421 U. S. 794, 95 S. C. 2031, 44 L. Ed. 2d 589.

The burden of showing essential unfairness must be sustained by the one who claims such injustice and seeks to have the result set aside. As the United States Supreme Court stated in Irvin v. Dowd, 366 U. S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751: "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

In this state a motion for a change of venue in a criminal case is addressed to the sound discretion of the trial court and its ruling will not be disturbed on appeal unless a clear abuse of discretion is shown. State v. Klatt, 187 Neb. 274, 188 N. W. 2d 821. While there was extensive pretrial publicity in the case now before us, we believe the record supports the action of the trial court in denying the motion for a change of venue and there was no abuse of discretion.

Defendant next contends that the trial court erred in failing to sustain defendant's motion to suppress all statements, admissions, and comments obtained from the defendant by law enforcement officers. Essentially the argument centers upon the fact that the Miranda rights were not included on the tape recording of the defendant's statement, and the defendant testified that the Miranda rights were never read to him, and that he requested the presence of his attorney.

Two police officers specifically testified that the Miranda rights were read to the defendant prior to the statement, that he responded affirmatively to each of them, and that the defendant did not request a lawyer and consented to give the statement at that time. The defendant's argument is that because the giving of the Miranda rights was not included on the tape recording, the absence from the recording is conclusive evidence that the rights were not given. Two police officers not only testified affirmatively that the Miranda rights were given, but explained why the tape recorder had not been turned on at the outset of the interrogation.

In this state the admission in evidence of a statement or confession constitutes the trial court's independent determination that the statement was voluntarily made. See State v. Davis, 180 Neb. 830, 146 N. W. 2d 220, cert. den., 386 U. S. 998, 87 S. Ct. 1320, 18 L. Ed. 2d 348. A finding by the trial court that a statement of an accused is voluntary will not ordinarily be set aside on appeal unless the finding is clearly erroneous. State v. Medina, 189 Neb. 765, 204 N. W. 2d 785. The trial court's finding of voluntariness is supported by the record and is not erroneous.

The defendant asserts that he was denied a fair trial and due process of law because of the State's prejudicial misconduct in withholding evidence favorable to the defendant in direct violation of the trial court's order concerning discovery and disclosure. In response to defendant's pretrial motions for disclosure and discovery, the trial court ordered the State to provide to the defendant for inspection and copying or photographing: (1) The defendant's statement; (2) the defendant's prior criminal record, if any; (3) the names and addresses of all witnesses on whose evidence the charge is based, including any witnesses which the prosecution intends to use in rebuttal; (4) the results and reports of

physical and mental examinations, and of scientific tests or experiments made in connection with this particular case; and (5) documents, papers, books, accounts, letters, photographs, objects, or other tangible things of whatsoever kind or nature which could be used as evidence by the State.

Defendant complains of violations which involve documents under paragraph 5 of the order and center around 18 police investigative reports which contained, in many instances, summaries of statements of witnesses as well as inferences or conclusions of officers as to the validity and veracity of portions or all of the witnesses' statements. The defendant asserts that if the testimony of a witness at trial differed in any respect from the statement as reported in the police report, the State should have delivered the police report to the defendant prior to trial. Such a conclusion is wholly unwarranted. At the hearing on defendant's motion for new trial, the alleged violation of the discovery order was raised and evidence introduced, and the trial court, on this issue, specifically found: "Nothing in the exhibits appears to be materially at odds with the testimony given at the trial. Those who testified were subjected to cross-examination at length by defendant's counsel or were called as witnesses for the defendant. No showing is made that information in the police reports could have been used to impeach any witness." The record fully supports that conclusion, and also establishes without serious question that the information in the police reports was not exculpatory or a mitigation of the degree of the offenses which would have been required to have been disclosed by the prosecution.

The defendant's position is that if a defendant has made a general motion for discovery and disclosure which has been granted in the sense that it covers documents of whatsoever kind or nature which could be used as evidence by the State, the State is re-

quired to produce for the defendant anything which might aid in his defense. We can find no support for such a contention. In Moore v. Illinois, 408 U. S. 786, 92 S. Ct. 2562, 33 L. Ed. 2d 706, the United States Supreme Court said: "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." In a similar vein, this court said: "We have not yet reached the point in this state where the county attorney is required to give his entire work product to the defense." State v. Williams, 183 Neb. 257, 159 N. W. 2d 549.

In United States v. Agurs, 427 U. S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342, the United States Supreme Court said: "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."

In State v. Isley, 195 Neb. 539, 239 N. W. 2d 262, this court said: "In a criminal case, the trial court is vested with broad discretion in considering discovery requests of defense counsel and error can be predicated only upon an abuse of such discretion." There was no abuse of discretion here.

The defendant assigns as error the trial court's refusal to instruct the jury with regard to the consequences of an acquittal by reason of insanity. The recent case of State v. Reitenbaugh, 204 Neb. 583, 284 N. W. 2d 19, has determined the issue adversely to the defendant. In that case we held: "It is not error to refuse to instruct a jury in a criminal case of the consequences of a verdict of not guilty by reason of insanity."

Defendant also assigns as error the trial court's failure to dismiss or to direct a verdict in favor of the defendant as to the first degree sexual assault count. For almost a century it has been the rule in this state that: "It is only where there is a total

failure of competent proof in a criminal case to support a material allegation in the information, or where the testimony adduced is of so weak or doubtful a character that a conviction based thereon could not be sustained, that the trial court will be justified in directing a verdict of not guilty." State v. Webb, 197 Neb. 662, 250 N. W. 2d 625.

While the evidence in this case may be entirely circumstantial as to the sexual assault charge, there can be no real doubt that it was more than sufficient to go to the jury, and the trial court did not err in overruling the motion for directed verdict.

Finally, the defendant contends that the sentence of death is excessive relative to the facts of the case under the applicable statutory considerations.

Following the introduction of evidence at a sentencing hearing, the three-judge panel specifically found that the following aggravating circumstances were present: (1) That defendant had been previously convicted of another crime involving the use of threat or violence to the person, and had a substantial history of serious assaultive criminal activity; (2) that the murder of Catherine M. Brooks was committed in an apparent effort to conceal the identity of the perpetrator of a crime, but that the murder of Patricia McGarry was not; (3) that both murders were especially heinous, atrocious, cruel, and manifested exceptional depravity by ordinary standards of morality and intelligence and totally without any regard for human life; and (4) that at the time the murder was committed the defendant also committed another murder.

The sentencing panel found as the single mitigating circumstance that the defendant possesses an antisocial personality which, with his intoxication from the use of alcohol and drugs and emotional disturbance at the time he committed the murders, did, in some manner, diminish the defendant's capability to conform his conduct to the requirements of the

law, but not to such an extent as to excuse him for the legal consequences of his conduct in the commission of the crimes.

The sentencing panel further found that the aggravating circumstances outweighed any mitigating circumstances. The panel then imposed the death penalty on each count of first degree murder.

The procedures of the sentencing panel complied fully with the statutory standards and specific procedures applicable to trial courts in cases of conviction for murder in the first degree. See Chap. 29, art. 25, R. R. S. 1943, and R. S. Supp., 1978.

Chapter 29, article 25, includes the provisions contained in L.B. 711, Laws of 1978, now codified as sections 29-2521.01 et seq., R. S. Supp., 1978, which apply primarily to the method of imposition of death sentences in the trial court and review of such sentences by the Supreme Court. The expressed purpose of L. B. 711 is to apply scrupulous standards of fairness to the imposition of the death penalty to insure that the death penalty should be applied uniformly and not arbitrarily.

Sections 29-2521.02 and 29-2521.03, R. S. Supp., 1978, provide that the Supreme Court shall, within a reasonable time after July 22, 1978, review and analyze all cases involving criminal homicide committed on or after April 20, 1973, and that the Supreme Court, upon appeal, shall determine the propriety of the sentence in each case involving a criminal homicide "by comparing such case with previous cases involving the same or similar circumstances. No sentence imposed shall be greater than those imposed in other cases with the same or similar circumstances." In the context of Chapter 29, article 25, the word "sentence" in section 29-2521.03, R. S. Supp., 1978, is construed to mean a sentence of death, and the provisions of that section directing the determination by the Supreme Court of the propriety of a "sentence" by comparison with previous

cases are applicable only in a case where a sentence of death has been imposed.

A primary foundation, basic to the review of the statutory provisions referred to, is the fact that in this state first degree murder is the only crime for which the penalty of death can be imposed. The provisions of Chapter 29, article 25, dealing with sentencing, apply only to a conviction for first degree murder under section 28-303, R. S. Supp., 1978. See §§ 29-2519 and 29-2520, R. S. Supp., 1978. The Nebraska act, L.B. 711, Laws of 1978, was patterned after the Georgia act which requires the Georgia Supreme Court to review death sentences and determine: "Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." § 27-2537, Georgia Code. That identical language appears in section 29-2522 (3), R. S. Supp., 1978, which applies primarily to initial sentencing in the trial court. The Georgia Supreme Court has restricted its review and comparison of "similar" cases to cases involving crimes for which the death penalty is permissible. It should be noted also that in Georgia the death penalty is permissible for more than one specific crime. The review and comparison by the court has been restricted to cases involving the identical crime—felony murder against felony murder, rape against rape. Coley v. State, 231 Ga. 829, 204 S. E. 2d 612. The Georgia cases reflect the obvious fact that it is a practical impossibility to make any meaningful comparison of a death sentence in a first degree murder case with any sentence imposed for another crime for which the death sentence is not authorized.

There is language in at least two sections of L.B. 711, Laws of 1978, directing the Supreme Court to review and analyze "all criminal homicides." If the language be interpreted to extend beyond first degree murder convictions, problems relating to the exercise of prosecutorial discretion in homicide

cases and the exercise by juries of the decisional power of determining guilt or innocence or fixing degrees of culpability in homicide cases are all involved. To interpret that language of L.B. 711 literally would create insurmountable constitutional problems. In view of the disposition made here, it is unnecessary to discuss constitutional issues.

For all these reasons L.B. 711, Laws of 1978, codified as part of Chapter 29, article 25, R. S. Supp., 1978, will be construed to require the Supreme Court to review and analyze only cases involving a conviction for first degree murder committed on or after April 20, 1973. Where a death sentence has been imposed, and this court is required to determine the propriety of that sentence in such case, the determination of which previous first degree murder cases involve the same or similar circumstances and are therefore comparable will be made by this court on a case-by-case basis.

Our review and analysis includes first degree murder convictions for offenses committed on or after April 20, 1973, including cases presently pending in this court on appeal. Thirty-two cases are included in that review in addition to the case now before us. Twenty-one cases have been before this court previously on appeal. Eight cases were not appealed. Three additional cases are now pending in this court on direct appeal. Seven death sentences are now pending including the case now before us. The remaining twenty-five cases involve life sentences. The cases reviewed and analyzed are set out in the addendum to this opinion.

Analysis of all these cases indicates that a callous, coldblooded, and cruel disregard for human life, coupled with convictions for previous crimes involving violence to the person, has tended to be given great balancing weight as aggravating circumstances, and that extreme youth, coupled with the absence of any substantial record of previous crimi-

nal conduct, has tended to be given great balancing weight as mitigating circumstances. In all the death penalty cases previously affirmed or now pending in this court, each has involved at least three separate and distinct statutory aggravating factors and only one or no statutory mitigating factors. The case now before us also fits that pattern, and, in addition, is the only death sentence case now pending which involves multiple first degree murders.

It would be virtually impossible to find two murder cases which are the same in all respects. We find no case in which a life sentence was given which involves the same or similar circumstances to that of the case at bar. Any objective weighing and balancing of aggravating and mitigating circumstances and comparison to the other death penalty cases now pending establishes that the death sentence in the case now before us is not excessive or disproportionate to the death penalties imposed in the other death penalty cases. If sufficient aggravating circumstances existed in those cases to justify the imposition of the death penalty, then the merciless, callous murder of two defenseless women in this case provided ample justification for the death penalty here.

The defendant's remaining assignments of error are without merit, and the convictions and sentences are affirmed.

AFFIRMED.

### ADDENDUM

First degree murder cases analyzed and reviewed as of November 1, 1979.

CASES APPEALED AND REPORTED

State v. Casper, 192 Neb. 120, 219 N. W. 2d 226.
State v. Wilson, 192 Neb. 435, 222 N. W. 2d 128.
State v. Nokes, 192 Neb. 844, 224 N. W. 2d 776.
State v. Russell, 194 Neb. 64, 230 N. W. 2d 196.
State v. Harris, 194 Neb. 74, 230 N. W. 2d 203.

State v. Lytle, 194 Neb. 353, 231 N. W. 2d 681.
State v. Ell, 196 Neb. 800, 246 N. W. 2d 594.
State v. Sims, 197 Neb. 1, 246 N. W. 2d 645.
State v. Stewart, 197 Neb. 497, 250 N. W. 2d 849.
*State v. Rust, 197 Neb. 528, 250 N. W. 2d 867.
*State v. Holtan, 197 Neb. 544, 250 N. W. 2d 876.
State v. Simants, 197 Neb. 549, 250 N. W. 2d 881.
State v. Record, 198 Neb. 530, 253 N. W. 2d 847.
*State v. Peery, 199 Neb. 656, 261 N. W. 2d 95.
State v. Beans, 199 Neb. 807, 261 N. W. 2d 749.
State v. Scott, 200 Neb. 265, 263 N. W. 2d 659.
State v. Simpson, 200 Neb. 823, 265 N. W. 2d 681.
State v. Prim, 201 Neb. 279, 267 N. W. 2d 193.
State v. Fuller, 203 Neb. 233, 278 N. W. 2d 756.
State v. Nielsen, 203 Neb. 847, 280 N. W. 2d 904.
State v. Bennett, 204 Neb. 28, 281 N. W. 2d 216.

## CASES NOT APPEALED TO SUPREME COURT

| | |
|---|---|
| State v. Jimmie Ray Anderson<br>Sentence 7/26/73. | Dawson County – District Court<br>Case No. 14391 |
| State v. Kelvin Anderson<br>Sentence 9/25/78. | Douglas County – District Court<br>Doc. 102, p. 85 |
| State v. Brown<br>Sentence 3/25/74. | Douglas County – District Court<br>Doc. 88, p. 625 |
| State v. Floyd<br>Sentence 5/16/78. | Hamilton County – District Court<br>Doc. 24, p. 196 |
| State v. Hatcher<br>Sentence 4/14/78. | Douglas County – District Court<br>Doc. 101, p. 321 |
| State v. Marshall<br>Sentence 3/13/78. | Lancaster County – District Court<br>Doc. 48, p. 262 |
| State v. Rowert<br>Sentence 12/8/77. | Platte County – District Court<br>Case No. 2805 |
| State v. Schaeffer<br>Sentence 9/30/77. | Hall County – District Court<br>Doc. 28, p. 279. |

## CASES PENDING ON APPEAL IN SUPREME COURT NOVEMBER 1, 1979.

| | |
|---|---|
| *No. 42204 – State v. Otey<br>Sentence 6/20/78 | Douglas County – District Court<br>Doc. 101, p. 489 |
| *No. 42301 – State v. Anderson<br>Sentence 8/24/78 | Douglas County – District Court<br>Doc. 99, p. 392 |
| *No. 42302 – State v. Hochstein<br>Sentence 8/24/78 | Douglas County – District Court<br>Doc. 99, p. 394. |

*Death sentence pending.

KRIVOSHA, C.J., concurring in part, and in part dissenting.

With all due respect to my brothers who make up

the majority in this case, I must in part dissent from their decision in this case. I wholeheartedly concur in all the conclusions reached by the majority, including its analysis and interpretation of how we are to apply L.B. 711, Laws 1978, except as to its single conclusion that the death penalty should be imposed in this case. My review of those cases included in the majority's addendum compels me to reach a contrary conclusion. I would modify the judgment of the trial court by declaring that the defendant be sentenced to a term of life imprisonment rather than be sentenced to execution.

So that there be no confusion with regard to the matter, let me clearly and unequivocally state that my decision is not based upon any conviction that in no case should the death penalty be imposed. Quite to the contrary, I am of the mind that in an appropriate case under the law as it presently exists, the imposition of the death penalty would be both lawful and appropriate. It is just that I conclude in this case the law does not authorize the imposition of the death penalty.

I totally reject the contention made by some that the imposition of the death penalty is either immoral or unethical when imposed by a society pursuant to its criminal code and subject to the further require- ment that the defendant be afforded due process of law. We find the imposition of capital punishment in an appropriate case provided for as early as the Mosaic Code and perhaps even before. I have difficulty concluding that that which is embodied in the Mosaic Code can be either unethical or immoral.

It is true that some societies, through the ages, have discriminated in the manner in which capital punishment has been administered or have imposed it in a barbaric manner. Neither of those actions can be condoned. But the mere fact that a society prescribes the imposition of the death penalty in an

appropriate case does not cause it to be either immoral or unethical.

I, likewise, reject the contention made by some that the imposition of the death penalty serves as a deterrent to future crime. The evidence with regard to that matter is either totally lacking or, if available, is so inconclusive that it is not reliable. Except in rare instances, the crime itself for which the penalty is imposed is of such a nature that few, if any, give much thought to the ultimate consequences.

My rationale for recognizing the right of a society to impose capital punishment in an appropriate case is, rather, based upon a view that a civilized society has a right to assign to that crime or crimes, which it considers to be the most heinous, the most severe penalty it can inflict. That is to say, a society may declare in advance what crime or crimes it considers to be of the highest order and the worst offense to mankind by providing for a penalty which likewise is of the highest order and the most severe. In so doing, the society has clearly and unequivocally announced to its members that this crime for which the ultimate penalty is imposed is a crime separate and apart from all other crimes which can or may be committed within the society. It is an attempt by the people, through their legislative body, to issue a pronouncement with regard to the nature of the crime. It is on that basis that I find the Legislature of this state may appropriately ascribe, as an alternative penalty for the commission of the most heinous crime (first degree murder), the imposition of the death penalty. It should therefore be clear then that my disagreement with the majority today is not based upon any notion that capital punishment is never appropriate.

My difficulty arises by reason of my analysis of the 32 cases reviewed by the majority in reaching its conclusion that the imposition of the death penalty in

this case is appropriate. The majority notes that "in all the death penalty cases previously affirmed or now pending in this court, each has involved at least three separate and distinct statutory aggravating factors and only one or no statutory mitigating factors * * * any objective weighing and balancing of aggravating and mitigating circumstances and comparison to the other death penalty cases now pending, establishes that the death sentence in the case now before us is not excessive or disproportionate to the death penalties imposed in the other death penalty cases." With that statement I agree. But it is my belief that the fact that this case squares with the seven other cases in which the death penalty has been imposed does not answer the question. I am more concerned, as I believe L.B. 711, Laws 1978, requires me to be concerned, as to how this case squares with the remaining 25 cases where the death penalty was not imposed.

It was noted by this court in State v. Stewart, 197 Neb. 497, 250 N. W. 2d 849, "Following the issuance of the opinion of the United States Supreme Court in Furman v. Georgia, 408 U. S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the Nebraska Legislature, in an effort to conform with the requirements for validity of death penalty statutes set forth in Furman, revised Nebraska's statute, and in 1973 enacted L.B. 268, R. R. S. 1943, which now appears as sections 29-2519 to 29-2546, R. R. S. 1943." L.B. 268, Laws 1973, prescribed a series of aggravating circumstances and mitigating circumstances which were to be considered by the trial court in determining whether to impose the death penalty. We early concluded that the fact that there was a list of aggravating circumstances and a list of mitigating circumstances did not mean that one was to simply add up the aggravating circumstances and add up the mitigating circumstances and subtract one from the other.

Again, in State v. Stewart, *supra*, we said, "'It

must be emphasized that the procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present. Review by this Court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case. No longer will one man die and another live on the basis of race, or a woman live and a man die on the basis of sex. If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great.' "

We further went on in State v. Stewart, *supra*, to quote from the Florida decision of Alvord v. Florida, 322 So. 2d 533 (Fla., 1975): " 'There is no way that the Legislature could program a judicial computer with all of the possible aggravating factors and all of the possible mitigating factors in each case. See State v. Dixon, supra. The law does not require that capital punishment be imposed in every conviction in which a particular state of facts occur. The statute properly allows some discretion, but requires that this discretion be reasonable and controlled. No defendant can be sentenced to capital punishment unless the aggravating factors outweigh the mitigating factors. However, this does not mean that in every instance under a set state of facts the defendant must suffer capital punishment.' " It therefore seems quite clear from what we have heretofore said that while L.B. 268, Laws 1973, prescribed aggravating and mitigating circumstances, they were intended to serve as a guide and not as an absolute. Some latitude was still left with the courts as to when the death penalty was to be imposed. Were

nothing more involved in this case than L.B. 268, Laws 1973, I might be able to agree with the majority. I must, however, continue my analysis of this case in light of the fact that after adopting L.B. 268, Laws 1973, our Legislature saw fit to adopt L.B. 711, Laws 1978. I must, therefore, presume that the Legislature intended L.B. 711, Laws 1978, to serve as either an addition to or a modification of L.B. 268, Laws 1973. Otherwise, there would have been little purpose or sense in adopting that second act. I believe that a reading of L.B. 711, Laws 1978, discloses that the Legislature intended to add to L.B. 268, Laws 1973.

Under the provisions of L.B. 711, Laws 1978, we are now not only required, before imposing the death sentence, to consider aggravating and mitigating circumstances but we are further required, under the provisions of section 29-2521.03, R. S. Supp., 1978, to "determine the propriety of the sentence in each case involving a criminal homicide by comparing such case with previous cases involving the same or similar circumstances. No sentence imposed shall be greater than those imposed in other cases with the same or similar circumstances." What constitutes a "circumstance" is not spelled out. Likewise, L.B. 711, Laws 1978, imposes on the trial court in the first instance, and this court on appeal, a duty before ordering the death penalty to consider (1) whether sufficient aggravating circumstances exist to justify imposition of a sentence of death, (2) whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances, or (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Subsection (3) was added to L.B. 268, Laws 1973, by L.B. 711, Laws 1978. The Supreme Court is authorized to reduce any sentence it finds not to be consistent

with sections 29-2521.01 to 29-2521.04, 29-2522, and 29-2524, R. S. Supp., 1978. All of that makes it seem clear to me that not only is this court required to examine aggravating and mitigating circumstances, but in addition to that we are supposed to in some manner place each first degree murder case one on top of the other to see whether or not they all conform. While I may be the first to concede that imposing such a duty upon the court is at best difficult and perhaps impossible, nevertheless, I cannot find how I can ignore that requirement. I do not by saying this suggest that the majority has ignored that requirement. They have reached a different conclusion by reason of making a significant distinction in the circumstances. For me, however, once the act of intentionally killing another is established, I find the other circumstances to be of less significance and therefore the distinctions much more difficult to make. It is in this area where I differ with the majority. It is simply a fact that when I place the cases one on top of the other, I do not reach the same conclusion as reached by the majority. For me, factors such as the age of the defendant or the previous record of the defendant are not nearly as significant as the circumstances under which the murder was committed.

Of the remaining 25 cases where life sentences have been imposed in lieu of death, I find the following to be true. In State v. Nokes, 192 Neb. 844, 224 N. W. 2d 776, the defendant pleaded guilty to one count of first degree murder for the killing of Wilma Hoyt and one count of second degree murder for the killing of Edwin Hoyt. The facts disclosed that the defendant shot and killed the couple, dismembered their bodies with a butcher knife, wrapped the pieces, and placed them in a freezer. Later the frozen pieces were removed from the freezer and thrown into a lake. The defendant was given a life sentence.

In State v. Sims, 197 Neb. 1, 246 N. W. 2d 645, the defendant was convicted of first degree murder. The facts disclose that prior to the shooting the deceased had been driving his automobile. The defendant and the deceased were involved in a near accident which resulted in the defendant having words with the deceased. After a brief conversation the defendant returned to his automobile. A short time later the defendant returned to the area where the deceased was parked. A passenger in the defendant's automobile stepped out of the car and fired a pistol in the air. The defendant removed a shotgun from the car and walked rapidly in the direction of the deceased who was standing against his car. The defendant stopped when he was about 10 feet away from the deceased and fired one shell which struck the deceased in the abdomen, causing his death. The defendant was sentenced to life imprisonment.

In State v. Stewart, 197 Neb. 497, 250 N. W. 2d 849, the evidence discloses that the defendant, though only 16 years of age, was engaged in the business of selling marijuana. He induced his suppliers to meet him so that he could "rip them off." The defendant, without provocation, shot the two dealers, hitting them in the back of the head, fatally shooting one who died instantaneously and wounding the other. The wounded one fell to the floor of the van and observed the defendant spreading gas in the van and igniting it in an effort to conceal the crime. The defendant was sentenced to life imprisonment.

In State v. Record, 198 Neb. 530, 253 N. W. 2d 847, the defendant and another were driving in an automobile when they decided to rob anyone who next came along. They drove to approximately 180th and Dodge Streets in Omaha and parked on a side road waiting for someone to drive by so that the defendant could shoot and rob someone. Approximately 3 a.m., a car driven by the victim passed their parked

car, proceeding east on Dodge Street. With one of the parties driving, the victim's car was pursued. As the car drove alongside it as if to pass, the defendant fired a shot, breaking the glass and killing the driver. The defendant was sentenced to life imprisonment.

In State v. Scott, 200 Neb. 265, 263 N. W. 2d 659, the defendant was charged with murder in the perpetration of or an attempt to perpetrate a robbery. The evidence discloses that the defendant entered the home of William and Bertha McCormic in Omaha and demanded money at gunpoint. A scuffle ensued and Mr. McCormic was shot twice and killed, and Mrs. McCormic was shot twice and wounded. Mr. McCormic was 92 years of age at the time. Mrs. McCormic, age 83, had impaired vision and could not describe her assailant with any specificity. The defendant was sentenced to life imprisonment.

In State v. Prim, 201 Neb. 279, 267 N. W. 2d 193, the defendant was charged with first degree murder, having shot and killed the defenseless operator of a gas station during the commission of a robbery. He was sentenced to life imprisonment.

Likewise, there are eight additional cases included in the addendum in which a life sentence was imposed for first degree murder and not appealed to this court. In State v. Anderson the defendant, though admittedly only 15 years old, had three previous felonies. During the course of a robbery committed by jumping into the victim's automobile, the defendant shot the victim in the head. He was sentenced to life imprisonment.

In State v. Hatcher the defendant, being pursued by a police officer, engaged in a struggle with the police officer, and as the officer struggled with the defendant the officer's gun went off twice, the second time hitting the officer in the head. The defendant was sentenced to life imprisonment.

In State v. Brown the defendant killed his victim

during a robbery. He was sentenced to life imprisonment.

In State v. Jimmie Ray Anderson, the 34-year-old defendant and his wife resisted arrest by a patrolman and in the struggle in the police car the patrolman was shot and killed. The defendant was sentenced to life imprisonment.

In State v. Schaeffer, the defendant, a 16-year-old, together with a friend, forced the owner of the Ace Hardware Store in Grand Island into their car at gunpoint where, after robbing him, they shot him 17 times. The defendant was sentenced to life imprisonment.

In State v. Floyd, the defendant, 37 years old, shot and killed an unarmed gas station attendant during the course of a robbery. He was sentenced to life imprisonment.

In State v. Rowert, the 23-year-old defendant who had been drinking robbed another who also was intoxicated and who had a substantial sum of money on his person. The defendant determined to kill the victim so that the defendant could not be identified. The defendant lured the victim out of a bar and drove him out into the country where he took the money and then slit the defendant's throat and then decapitated him. He was sentenced to life imprisonment.

In State v. Marshall the defendant, a 20-year-old working in a flower shop in Lincoln, robbed the owner and in the course of the robbery struck the owner in the head several times with a metal bar from which the victim died. He was sentenced to life imprisonment.

In each of the cases I have referred to where a life sentence has been imposed, one can find distinguishing factors, to be sure, and in that regard I cannot quarrel with the majority in its conclusion. I'm simply unable to make such fine distinctions with regard to, on the one hand, the matter of killing and,

on the other hand, the imposition of the death penalty. I have difficulty seeing how the killing of a defenseless, faceless victim driving an automobile is any less heinous than the case at bar. Once the facts establish the totally unnecessary, meaningless, and wasteful but deliberate, intentional killing of another, I have difficulty significantly distinguishing the circumstances under which the crime was committed. It is my view that the Legislature, in adopting L.B. 711, Laws 1978, must have intended to further restrict the imposition of the death penalty as previously provided for in L.B. 268, Laws 1973, by directing us not to impose the death penalty if on previous occasions of cruel and senseless killings we have not imposed the death penalty.

My conclusions herein legitimately pose two questions: (1) If the death penalty is not appropriate in this case, when will it be appropriate, and (2) has the adoption of L.B. 711, Laws 1978, placed us into such a mold that we may no longer impose the death penalty under any circumstances where a single person has been given a life sentence under similar circumstances. With regard to the first question, let me simply say that I believe I will recognize an appropriate case when I see it. I have no doubt that given that appropriate case, based upon all the things we have done in cases heretofore, I will be able to conclude that the imposition of the death penalty is intended even in light of L.B. 268, Laws 1973, and L.B. 711, Laws 1978, and I will be able to affirm the imposition of that penalty. Unfortunately, I cannot in advance articulate how or under what circumstances that may be.

With regard to the second question, whether we are now in such a mold from which it may be difficult, if not impossible, to get out, I can simply say that that is a matter which must appropriately be considered by the Legislature. Too often, courts are accused of intruding into the legislative arena. I

choose not to do so. I believe the Legislature intended to limit situations in which the death penalty is imposed. If, in fact, the passage of L.B. 711, Laws 1978, has made the imposition of the death penalty difficult, if not impossible, then it is for the Legislature to reconsider its action.

Nothing I have said here should in any manner be misconstrued so as to permit one to conclude that I do not consider the commission of murder a heinous, appalling, and virtually unforgiving crime. Indeed I do. I hold no belief that one who commits such a crime is entitled to anything other than the most severe punishment. I am, however, constrained in my actions as a judge. On the one hand, I am obligated to impose a penalty required by law even in those instances where I may personally disagree. By the same token, I must likewise refrain from imposing a penalty where restrained by the law, even in those cases in which I may personally disagree. That is the situation in which I find myself in this case. The murder in this case was a terrible, horrible, unforgiving crime. Yet it is likewise, in my mind, no worse (if such comparison with regard to murder can be made) than the senseless and meaningless taking of lives for which we have heretofore imposed life sentences. It is for that reason that I would disagree with the majority in that one limited area, and I would modify the judgment herein to provide that the defendant should be confined in the Nebraska Penal and Correctional Complex for the remainder of his natural life.